## HOME BENEFICIAL LIFE INS. CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.
### No. 5515.

Circuit Court of Appeals, Fourth Circuit.
Jan. 7, 1947.

Patrick A. Gibson, of Washington, D. C., and T. Justin Moore, of Richmond, Va. (Francis V. Lowden, Jr., and Hunton, Williams, Anderson, Gay & Moore, all of Richmond, Va., on the brief), for petitioner.

Morris P. Glushien, Associate Gen. Counsel, National Labor Relations Board, of Washington, D. C. (Gerhard P. Van Arkel, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Dominick L. Manoli and Arnold Ordman, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before. PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This labor dispute grows out of the discharge of certain agents of the Home Beneficial Life Insurance Company and the refusal of the company to reinstate them. The men had disobeyed a rule of the company, and the issue to be determined is whether or not at the time of the discharge the men were engaged in a strike which had been undertaken in order to secure a modification of the rule. The Board held that the strike had begun when the discharge took place, and that the discharge was merely a tactical maneuver to induce the men to resume work and was not intended to terminate the employer-employee relationship. Subsequently the men offered to return to work, but the company refused to reinstate them and the Board held that this action was a violation of Sections 8(1) and 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3), in that it interfered with the men in the exercise of the rights guaranteed them by Section 7 of the Act, 29 U.S.C.A. § 157, and discouraged membership in the union. With certain exceptions, not material here, the Board adopted the findings and conclusions of the trial examiner to whom the case was referred for hearing.

The Insurance Company is engaged in the sale of ordinary and industrial life, benefit and accident insurance, and maintains twenty-six district offices in the District of Columbia and in Virginia, Delaware, Maryland and Tennessee. It employs seven hundred and sixty agents to sell insurance, collect premiums and service policies. The agents at ten offices of the company in the District of Columbia, Maryland, Virginia and Tennessee are involved in this case. A large part of the business of the company is the sale of industrial policies, and the great bulk of the work of the agents is performed outside the district offices. They visit the homes of the policy holders' weekly to collect premiums and make payment of sick claims. They turn in their collections to the district offices, report and receive information as to the placing of policies and the making of claims, and give and receive information as to their routes or debits, as the groups of policy holders assigned to the agents are called. The prompt return of the collections and the prompt settlement of claims are highly important to the success of the business, and on this account a long standing rule of the company requires the agents to report to their respective offices each morning except Sunday before they begin their outside work.

The agents are members of certain locals of the American Federation of Industrial and Ordinary Insurance Agents' Union with which the company has had collective bargaining contracts since 1940. The reporting rule was modified in 1938 to excuse the men from reporting on Saturday, but the five-day requirement was included in the contracts with the union, the last of which expired December 5, 1942. Negotiations for a new contract were begun in January, 1943. The bargaining went on for several months, but the parties were unable to agree on certain matters, and on October 6, 1943 the disputed issues were referred to the National War Labor Board, but the question as to the reporting rule was not referred since the union apparently abandoned its position in this respect. The case was still pending before this Board on August 4, 1944 when the union renewed its request for modification of the reporting rule, but the company refused. Thereupon the union filed notice under the War Labor Disputes Act, 50 U.S.C.A. Appendix, § 1501 et seq. (1944), requesting that a strike vote be taken, but the request was denied on the ground that the company was not a war contractor within the meaning of the statute. The union then invoked the aid of the United States Conciliation Service, and during the negotiations which followed, the possibility of a strike was discussed. The efforts at conciliation failed, and in September the dispute was certified to the National War Labor Board. That Board notified the union that if a strike occurred, it would suspend action upon the dispute relating to the report days; and for some weeks the matter lay in abeyance.

The controversy was brought to a critical point on Monday, October 9, 1944 when the union notified the company that the Washington agents had voted tem-

porarily to report to their offices only on Wednesday and Thursday of each week, beginning Tuesday, October 10. The company wired back on October 9 that it was necessary to refuse the request to modify the rule and that any willful and deliberate violation of the rule on and after October 11 would result in dismissal. After this exchange of telegrams the company notified the United States Conciliation Commissioner, and he arranged a conference between the parties for Thursday, October 12.

In the meantime, the agents did not report on Tuesday, October 10, but did report on Wednesday, October 11, and at this time the company's telegram was read to them. They reported again on Thursday morning, October 12. The union consulted its attorney who was doubtful whether the activity contemplated in the union's telegram of October 9 was within the protection of the National Labor Relations Act, and advised the men either to obey the company's rule or not to go to work at all, that is, to go on a strike. The local held a meeting at noon on Thursday, October 12, at which the men selected a committee to attend a conference between the union and the company representatives to be held that day and authorized the committee to call a strike as of October 13 if the conference failed to reach a satisfactory agreement.

The conference was held that night at Richmond and was attended by representatives of the company, representatives of the union, and their respective attorneys. The company refused to modify the rule, and its attorney declared on its behalf that the agents who failed to report in accordance with the rule the next morning would be discharged. Representatives of the union conferred with their attorney out of the presence of the representatives of the company, and the union was advised that if the men went on strike, then they were protected under the labor statute. Thereupon they requested the union attorney to notify the company that they would strike on the following morning.

The union's attorney, however, failed to give this specific information to the company. In his testimony at the hearing he quoted the exact language he used as he wrote it down as follows: "Members of the union or other agents who did not report for duty tomorrow or at any other time did so for the purpose, by concerted action, of enforcing demands for relief from a situation created by the gas shortage." He testified that he had taken pains to use these precise words for a particular purpose which he did not disclose. The reason doubtless was that the National War Labor Board had notified the union that if a strike occurred, the Board would suspend action upon the dispute as to the report days. At any rate the word "strike" was not used; and when the company's attorney suggested that the union's attorney was getting technical and inquired if he meant that a strike would be called, and further stated that the company expected to have a strike sooner or later and was prepared for it, the union's attorney gave no further answer or explanation. The next day, October 13, the union's attorney, using substantially the same language as on the night before, sent the following telegram to the company on behalf of the union:

"As company was informed last night, members of union or other agents who do not report for duty do so for purpose, by concerted action, of enforcing demands for relief from situation created by gas shortage. If any agent is or has been discharged, agents thereafter failing to report do so to support such discharged agents by concerted action, in addition to purpose of enforcing aforesaid demand, company will be held responsible under Wagner Act for all discharges under foregoing circumstances."

The same day the agents failed to report in the morning, and the company, believing that they were merely persisting in their disobedience to the rule, discharged them.

The fact was, however, that a substantial number of the men began a strike on that day in accordance with the action taken by them at their meetings on the day before. A few days later the National War Labor Board returned the dispute as to the reporting rule to the Conciliation Service, and conferences between the representatives of the union and representatives of the company took place. The conferees endeavored

without success to settle all matters in dispute between the parties; and finally, on November 11, the president of the union made the unconditional offer that the men be permitted to resume work on Monday, November 13. At that time the places of the agents, with one possible exception, had not been filled, but the company refused the offer on the ground that the men had been lawfully discharged and that it would not reinstate them unless all matters in dispute were settled. This action of the company was the basis of the order of the Board whereby the company was directed to cease and desist from discouraging membership in the union, from interfering with the employees in the exercise of the right of self organization, and to offer full reinstatement to the discharged employees and make them whole for any loss of pay which they suffered from November 11, 1944, by reason of the company's refusal to reinstate them.

■ Two findings of fact made by the examiner seem to us to be without support in the evidence. They are: (1) That the discharge of the Washington agents was not intended to effect a permanent termination of the employer-employee relationship, but was a tactical maneuver designed to induce the agents to abandon the strike and resume work; and (2) that the company knew that the Washington agents were on strike on October 13 when the discharge took effect. Every circumstance indicates that the discharge was final and sincere. Indeed the attorneys for the respective sides stipulated at the beginning of the hearing that the Washington agents were discharged on October 13. It is abundantly shown that the daily collection of numerous small sums of money and the daily adjustment of numerous small claims led the company to believe that the reporting rule was a requirement that was not only reasonable but vital to the successful operation of the business. The rule had been included in all prior agreements. The company had consistently opposed any relaxation of it, and the notice from the agents on October 9 that they proposed to violate the rule was immediately met by a notice of discharge. It is especially significant that the notice of discharge was given before the strike was decided upon; and that even after the strike

had been called off and the men came back to work, the company was adamant in its refusal to reinstate the Washington agents. How then can it be said that the company was not in earnest when it discharged them?

Similarly, the finding that the company knew that the strike of the Washington agents began on October 13 is without foundation. The statements made by the union and its attorneys were carefully phrased to conceal the strike. It was not said, as is usually said with great emphasis when the demands of employees are refused, that the agents would strike, but that they would not report in accordance with the company's rule; and the failure to report on Friday, October 13, was in harmony with the telegram of October 9 that the agents would report only on Wednesday and Thursday of each week. We think that the evidence justifies no other finding than that the company did not know of the strike on Friday, October 13, when it discharged the men.

■ If the situation had actually been, as the company believed it to be, the company would have been well within its rights in discharging the Washington agents and in refusing to reinstate them. The statute, (§ 7), expressly recognizes the right of employees "To engage in concerted activities" but does not and could not confer upon them the right to engage en masse in unlawful activities, or, to defy the authority of the employer to manage his business while remaining in his service. When they engage in an unlawful sit-down strike, as in National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 254, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, they may be discharged by an employer, even though he has been guilty of unfair labor practices; and when, as here, they refuse to obey the rules laid down by a law-abiding management for the conduct of the business, they may be discharged and their places may be permanently filled. Even if they subsequently engage in a strike, the employer may fill the places left vacant and is not obligated to discharge the new employees when the strikers change their minds and apply for reinstatement. N. L. R. B. v. Mackay Radio & Telegraph

Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed 1381; N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 344, 59 S.Ct. 508, 83 L.Ed. 682; Western Cartridge Co. v. N. L. R. B., 7 Cir., 139 F.2d 855, 858.

 On the other hand, it is established with equal finality that an employer who denies further employment to employees merely because they have taken part in a strike performs an unlawful act. Under Section 2(3) of the statute, 29 U.S.C.A. § 152(3), the term "employee" includes any individual whose work has ceased as a consequence of a current labor dispute and who has not obtained any other regular and substantially equivalent employment; and it has been held that the refusal of an employer to reinstate a striker, whose place has not been filled, constitutes a violation of Sections 8(1) and 8(3) of the statute. N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 344, 345, 58 S.Ct. 904, 82 L.Ed. 1381; N. L. R. B. v. Remington Rand, Inc., 2 Cir., 130 F.2d 919, 927, 928, certiorari denied, Central Executive Council of Remington Rand Employees' Ass'ns v. N. L. R. B., 304 U.S. 585, 58 S.Ct. 1061, 82 L.Ed. 1546; Firth Carpet Co. v. N. L. R. B., 2 Cir., 129 F.2d 633, 635, 636; Carter Carburetor Corp. v. N. L. R. B., 8 Cir., 140 F.2d 714, 718. N. L. R. B. v. Good Coal Co., 6 Cir., 110 F.2d 501, 502, 503, certiorari denied, 310 U.S. 630, 60 S.Ct. 978, 84 L.Ed. 1400; N. L. R. B. v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167, 176, certiorari denied, 308 U.S. 605, 60 S.Ct. 142, 84 L.Ed. 506.

██ The company contends that the validity of the discharges should be determined in the light of the knowledge which it had on October 13; and that if it did not then know that the strike was on, it cannot now be compelled to reinstate the strikers. We do not agree with this view. It would be correct, if the discharge had gone into effect before the strike took place; but since both events happened at or about the same time, we should recognize the existence of this strike as a factor of paramount importance, and give it the effect provided in the statute, although the decision to discharge in case of continued disobedience to the rule was first taken and first announced. We conclude that the men who struck on October 13 and offered to return on November 11 are entitled to reinstatement.

All the Washington agents did not strike on October 13. The examiner found that the *bulk* of them went on strike and ceased to work, and that all who failed to report were discharged. As to the rest of the agents the examiner made the following statement:

"The respondent introduced evidence indicating that a minority of the Washington agents, although not reporting at the office on October 13, did some work on their debits. This evidence might be interpreted as indicating that the Washington agents did not go on strike, but instead sought to continue working on their own terms. If that conclusion were justified, a question might arise as to whether such activity is entitled to any protection under the Act. The undersigned finds it unnecessary, however, for reasons to be related, to decide that precise question. First, the action of some of the men in working on the 13th was not the reason why those, or any other, agents were discharged. The evidence that they worked was not ascertained until sometime later. The respondent's reason for the discharges was that, as it supposed, the men were concertedly ceasing to work in protest against the report rule, and the respondent, as has been related, believed that it had a right to discharge them for so doing. The discharges were therefore effected because the agents were apparently engaging in activity of such character as, as has been previously found, to be protected by the Act. Discharges made upon such motives constitute unfair labor practices. Since the conduct of the agents after the discharges was not the cause of the discharges, it is immaterial whether any of the Washington strikers worked on October 13 or thereafter. It is consequently unnecessary to determine what the result would have been had they been discharged for such action. It is clear, moreover, that the Washington agents voted to engage in a complete work stoppage, and a majority of them refrained from working. In no event could the action of a minority who continued to work affect the rights of those who were bona-fidely on strike."

■ It seems clear to us that these conclusions cannot be sustained. Insofar as they deny the right of the company to discharge for concerted disobedience to its rule, they are in conflict with established doctrine, as we have shown; and insofar as they are based on the company's ignorance of the work done by the minority on October 13, they are invalid for the same reason that the company's ignorance of the strike did not deprive the strikers of their rights under the statute. The men who did not strike on October 13, but continued to work without reporting in the morning as required by the rule were discharged and ceased to be employees on that date. Although they subsequently associated themselves with the strikers, they did not thereby improve their position or gain the right of strikers to reinstatement. It follows that the order of the Board requiring the company to offer reinstatement to all the Washington agents who were discharged on October 13 cannot be sustained, and the case must be remanded to the Board to determine which of them failed to join the strikers but continued to work on October 13, so that their names may be omitted from the order. The following statement of the court in C. G. Conn, Limited, v. N. L. R. B., 7 Cir., 108 F.2d 390, 397, is especially pertinent:

"* * * We are unable to accept respondent's argument to the effect that an employee can be on a strike and at work simultaneously. We think he must be on the job subject to the authority and control of the employer, or off the job as a striker, in support of some grievance.

 * * * * * *

"We are aware of no law or logic that gives the employee the right to work upon terms prescribed solely by him. That is plainly what was sought to be done in this instance. It is not a situation in which employees ceased work in protest against conditions imposed by the employer, but one in which the employees sought and intended to continue work upon their own notion of the terms which should prevail. If they had a right to fix the hours of their employment, it would follow that a similar right existed by which they could prescribe all conditions and regulations affecting their employment."

■ The Board should also consider anew the date from which loss of back pay by the Washington strikers should be calculated. The examiner was of the opinion that back pay should run from October 13, the date of the discharge. But the Board, pointing out that the tenure of the strikers was not affected by the discharge prior to their offer to return to work on November 11, made the back pay run from that date. That ruling was based on the assumption that the company had knowledge of the strike from the beginning; but since the fact of the strike was withheld by the union from the company, the Board should consider the propriety of calculating the back pay from the date on which the Board shall find that knowledge of the strike was actually brought home to the company. It should be borne in mind that as the company saw it, the absence of the men from work was due to the discharge and not to the strike.

■ The pending case relates not only to the Washington agents but also to the agents at Norfolk and other cities. The sequence of events at the Norfolk office was similar to that in Washington. A vote of the agents to report only two days a week was taken on October 13, they went on a strike on October 20 and on the same day they were discharged. It is conceded, however, that unlike at Washington, the company had knowledge of the strike at the time.

■ At the other offices there were sympathetic strikes on various dates in October, and the insurance licenses of the agents were cancelled. All of the agents at Norfolk and the other cities were included in the offer to return to work, and since their places had not been filled, the order of reinstatement as to them will be enforced.

A decree will be entered enforcing the order except as to the Washington agents, and as to them the case will be remanded to the Board for additional findings and conclusions as indicated herein.