**TEXTILE WORKERS UNION OF AMER-ICA, CIO, and its Agents, et al., Petitioners,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 12248.**

United States Court of Appeals District of Columbia Circuit.

Argued May 4, 1955.

Decided Oct. 27, 1955.

Mr. David E. Feller, Washington, D. C., with whom Mr. Arthur J. Goldberg, Washington, D. C., was on the brief, for petitioners.

Mr. Owsley Vose, Attorney, National Labor Relations Board, of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of Court, with whom Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, was on the brief, for respondent. Mr. Robert G. Johnson, Washington, D. C., Atty., also entered an appearance for respondent.

Mr. Jerome Powell, Washington, D. C., entered an appearance on behalf of Personal Products Corp., as amicus curiae.

Before EDGERTON, BAZELON, and DANAHER, Circuit Judges.

---

EDGERTON, Circuit Judge.

This case is here on the Union's petition for review, and the Board's petition for enforcement, of a Board order.

One of the 1947 amendments of the National Labor Relations Act, § 8(b) (3), 61 Stat. 141, 29 U.S.C.A. § 158(b) (3), extends to unions the duty to bargain collectively. Section 8(d) defines bargaining collectively as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith * * * but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *." 29 U.S.C.A. § 158(d).

Shortly before a collective bargaining contract between the company and the Union expired on October 15, 1952, they began negotiations for a new contract. At the end of the year no agreement had been reached. The Union did not break off negotiations. The Board raised no question about the Union's having met and conferred with the company and participated in the argument and persuasion inherent in the bargaining process. The Board made no finding that the Union tried to "frustrate the duty to bargain collectively, by delivering an ultimatum on a 'take it or leave it' basis". Cf. 93 Cong.Rec. 4135. But the Trial Examiner and the Board found that the Union "decided 'to force the employer's hand in the then current negotiations,' not by a strike 'in the commonly understood sense of the word,' but by a series of unprotected harassing tactics: an organized refusal to work overtime, an unauthorized extension of rest periods from 10 to 15 minutes, the direction of employees to refuse to work special hours, slowdowns, unannounced walkouts, and inducing employees of a subcontractor not to work for the employer." The Board found that these tactics were "evidence that the [Union] failed to bargain collectively in good faith". The Board ordered the Union to "Cease and desist from: (a) Refusing to bargain collectively in good faith with the Company, by engaging in slowdowns and unauthorized extensions of rest periods; by engaging in walkouts or partial strikes for portions of shifts or entire shifts; by inducing employees of other concerns not to perform work for the Company; by refusing to work special hours or overtime; or by engaging in any similar or related conduct in derogation of the statutory duty to bargain * * *." We have to decide whether the order is valid.

Courts have held that similar union tactics are "unprotected", in the sense that employers may lawfully discharge employees for using them. But until now no court, as far as we know, has been called upon to consider the Board's theory that such tactics are evidence that a union is not bargaining in good faith and may therefore be forbidden. The theory will not stand analysis. There is not the slightest inconsistency between genuine desire to come to an agreement and use of economic pressure to get the kind of agreement one wants. As the Board intimated, the Union might have called a strike; no inference of failure to bargain in good faith could have been drawn from a total withholding of services, during negotiations, in order to put economic pressure on the employer to yield to the Union's demands. As a simple matter of fact, it is equally clear that no such inference can be drawn from a partial withholding of services at that time and for that purpose. There is no legal basis for ignoring this fact. Though the National Labor Relations Act encourages negotiation and seeks to reduce industrial strife, it does not forbid industrial strife. Aside from some specified conduct, such as jurisdictional strikes and secondary boycotts, we do not find that Congress limited the use of economic pressure in support of lawful demands.

International Union, UAW v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 519, 93 L.Ed. 651, like this case, involved "intermittent and unannounced work stoppages". There, as here, the "employer was not informed * * * of any specific demands which

these tactics were designed to enforce nor what concessions it could make to avoid them." The Union's tactics were "described by the union leaders as a new technique for bringing pressure upon the employer." 336 U.S. at pages 248, 249, 69 S.Ct. at page 519. In sustaining State legislation directed against such tactics, the Supreme Court said: "Congress made in the National Labor Relations Act no express delegation of power to the Board to permit or forbid this particular union conduct, from which an exclusion of state power could be implied. * * * [T]he conduct here described is not forbidden by this Act and no proceeding is authorized by which the Federal Board may deal with it in any manner." 336 U.S. at page 253, 69 S.Ct. at page 521.

We have discussed the part of the Board's order that is in issue. Other parts, not in issue because the Union does not contest them, direct the Union to cease and desist from "threatening" employees with "reprisals" for working overtime and for giving testimony in the proceeding before the Board; from blocking plant entrances so as to prevent ingress and egress of employees; and from in any other manner restraining or coercing employees in the exercise of their rights under the Act. This part of the order is not based on the collective bargaining requirements of the Act but on § 8(b) (1) (A), which makes restraint and coercion of employees by a union an unfair labor practice. The Board did not find, and does not suggest, that misconduct in general or abuse of employees in particular is evidence of a refusal to bargain in good faith with an employer.

So much of the Board's order as rests upon supposed refusal to bargain in good faith will be set aside. So much as rests upon restraint and coercion of employees will be enforced.

Enforced in part, set aside in part.

DANAHER, Circuit Judge (dissenting).

The Hearing Examiner and the Board without dissent found "upon the entire record in the case, and pursuant to § 10 (e) of the National Labor Relations Act" that the union had refused to bargain collectively in good faith with the company. The Board based its order not only upon the conduct and tactics described in the majority opinion as "unprotected," but upon a series of violations of § 8(b) (1) (A) involving threats of personal violence, impeding and interfering with employees who had been subpoenaed to testify and blocking of physical ingress to the plant. The Board is specifically empowered by § 10(a) of the Act to prevent any person from engaging in any unfair labor practice, and § 10(e) provides that "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." The union does not challenge the findings of the Board, it does not disclaim its campaign of "harassing tactics." On the contrary, it has insisted that its tactics comprise merely a proper use of its full economic strength, particularly since none of the specific limitations set forth by Congress are transgressed. It amounts to saying that so long as the union's purpose is not to destroy the employer, the union is free to adopt and put into practice any tactics it may select which have not been specifically interdicted by Congress and assigned to the Board's jurisdiction.

Putting aside the fact that the tactics were only one of the elements in the totality of the record, the majority say that the Board may not, as a matter of law, conclude that the tactics are "evidence" that the union is not bargaining in good faith. It seems to rest its conclusion upon International Union, UAW v. Wisconsin Employment Relations Board, 1949, 336 U.S. 245, 69 S.Ct. 516, 527, 93 L.Ed. 651. The Court there held that federal legislation afforded no basis "for denying to Wisconsin the power, in governing her internal affairs, to regulate a course of conduct neither made a right under federal law nor a violation of it and which

has the coercive effect obvious in this device." The Court did not have before it the question of whether the conduct in that case might constitute evidence of lack of good faith in bargaining. The Board here has not asserted that the "tactics" constitute a violation of federal law. It has said that such conduct taken into account with all other factors "on the entire record" justified a finding of failure to bargain in good faith.

Surely it is within the competence and one of the functions of the Board to inquire into and to decide problems arising from § 8(d) of the Act. The Labor Management Relations Act of 1947 imposed upon the unions identically the same duties to bargain in good faith which previously under the National Labor Relations Act, had applied only to employers. It is deemed unnecessary to cite the repeated instances to be found in the reported cases where an employer was found by the Board to have failed to bargain in good faith. See 29 U.S.C.A. § 158 note 265. In my judgment the union's actions were designed unilaterally to change working conditions during the bargaining process, in fact I can attribute no other effect to the series of sudden and unannounced walkouts of entire shifts, deliberate slowdowns and refusals to work overtime and special hours. Certainly, as the majority notes, the union could have called a strike, and thereafter it could have negotiated further with the employer. It could have continued its members at work while negotiations proceeded. It did neither. This was not "a situation in which employees ceased work in protest against conditions imposed by the employer, but one in which the employees sought and intended to continue work upon their own notion of the terms which should prevail. If they had a right to fix the hours of their employment, it would follow that a similar right existed by which they could prescribe all conditions and regulations affecting their employment." C. G. Conn, Ltd. v. National Labor Relations Board, 7 Cir., 1939, 108 F.2d 390, 397. National Labor Relations Board v. Rockaway News Supply Co.,

Inc., 1953, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832; Home Beneficial Life Ins. Co. v. National Labor Relations Board, 4 Cir., 1947, 159 F.2d 280, 286, certiorari denied, 1947, 332 U.S. 758, 68 S.Ct. 58, 92 L.Ed. 344.

The Supreme Court has repeatedly stated that one of the prime purposes of the National Labor Relations Act, as amended, is the achievement of industrial peace. As lately as last December the Court, in holding an employer guilty of an unfair labor practice, said, "If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, while continuing to bargain in good faith at least until the Board has given some indication that his claim has merit." Brooks v. National Labor Relations Board, 1954, 348 U.S. 96, 103, 75 S.Ct. 176, 181. Here the employer expressly turned to the Board. "[Congress] went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies." Garner v. Teamsters, Chauffeurs and Helpers Local Union, 1953, 346 U.S. 485, 490, 74 S.Ct. 161, 165, 98 L.Ed. 228. "On the basis of the allegations, the petitioners could have presented this grievance to the National Labor Relations Board. The respondents were subject to being summoned before that body to justify their conduct. We think the grievance was not subject to litigation in the tribunals of the State." Id., 346 U.S. at page 501, 74 S.Ct. at page 171.

In our case, the Board's opinion noted:

"The Respondents engaged in these unprotected concerted activi-

ties at a time when they purported to be conferring in good faith with the employer in negotiations. These unprotected tactics interfered with production and put strong economic pressure on the employer who was thereby disabled from making any dependable production plans or delivery commitments.[9] Moreover, the employer was not informed of any specific demands which these tactics were designed to enforce nor what concessions it could make to avoid them.[10] We think it clear that such unprotected harassing tactics were an abuse of the union's bargaining powers—'irreconcilable with the Act's requirement of reasoned discussion in a background of balanced bargaining relations upon which good faith bargaining must rest' [11]—which impaired the *process* of collective bargaining that Congress intended not only to encourage but to protect.

"Although the employer could legally have resorted to self-help by discharging employees for such conduct or by retaliating by shutdown, it did not do so. Nor did it refuse to bargain. Instead, it sought a much less drastic remedy by filing the present charge, requesting the Board to investigate and adjudge the Respondents' conduct under the federal act."

Yet if the majority be correct, the employer's remedy will be to discharge the employees who use unprotected tactics and retaliate by a shut-down. Surely, in the interest of elimination of industrial strife and the achievement of industrial peace, the processes of collective bargaining were imported into the federal law and are to be enforced. "The 1947 Act has increased, rather than decreased, the legal responsibilities of labor organizations. Certainly that Act did not expressly relieve labor organizations from liability for unlawful conduct. It sought primarily to empower a federal regulatory body, through administrative procedure, to forestall unfair labor practices by anyone in circumstances affecting interstate commerce." United Construction Workers, Affiliated with United Mine Workers of America v. Laburnum Const. Corp., 1954, 347 U.S. 656, 666, 74 S.Ct. 833, 839, 98 L.Ed. 1025. Thus Congress imposed upon the union, as previously upon the employer, the duty to bargain in good faith. The Board here concluded unanimously that the union had failed to bargain in good faith. "Respondent's unilateral action in changing working conditions during bargaining, *now admitted to be a departure from good faith bargaining*, is the subject of an enforcement order issued by the court below and not challenged in this Court." (Emphasis supplied.) National Labor Relations Board v. American Nat. Ins. Co., 1952, 343 U.S. 395, 409, 72 S.Ct. 824, 832, 76 L.Ed. 1027. What applies to the employer applies to the union, in my understanding.

It seems to me that the majority errs in dealing with this case as though, once again, the same judges were confronted with a situation such as was presented in Local Union No. 1229, International Brotherhood of Elec. Workers, v. N. L. R. B., 1952, 91 U.S.App.D.C. 333, 202 F.2d 186, reversed, 1953, 346 U.S. 464, 74 S.

"9. This type of disruption is not a concommitant [sic] of a strike; there, after the initial surprise of an unannounced walkout, the company knows what it has to do and plans accordingly. See International Union, UAW, AFL, Local 232 v. W. E. R. B., 336 U.S. 245, at [page] 249 [69 S.Ct. 516, 93 L.Ed. 651]." [This footnote to the Board's opinion impels recourse to the Supreme Court's opinion for a larger understanding of the Board's reference.]

[10. Omitted]

"11. The Board so characterized a slow-down during the course of negotiations in Phelps Dodge Copper Products Corporation, 101 N.L.R.B. 360 at 368." [Again, the Board's footnote is pointed. Collaterally it may be noted that to the extent a strike may be proscribed by the Act, its language also includes, by definition, "any concerted slow-down or other concerted interruption of operations by employees." 29 U.S.C.A. § 142.]

Ct. 172, 98 L.Ed. 195. We are not called upon to decide whether the tactics here have been withdrawn from the protection of § 7 of the Act, although the majority recognize that "Courts have held that similar union tactics are 'unprotected,'" as the Board found.[1] Nor, in my judgment, is it correct for the majority to say that because a strike could have been called, no bad faith "inference can be drawn from a partial withholding of services . . . in order to put economic pressure on the employer." A lawful strike is one thing, and a "sit down" strike is another. National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 59 S. Ct. 490, 83 L.Ed. 627. And see National Labor Relations Board v. Local Union No. 1229, International Brotherhood of Electrical Workers, 1953, 346 U.S. 464, in footnote 13, at page 478, 74 S.Ct. 172, 98 L.Ed. 195, and cases cited.

In a lawful strike, the strikers under the Act still retain the status of "employees" and have all the advantages to which they and their organization are entitled under the law. But "An employee can not work and strike at the same time. He can not continue in his employment and openly or secretly refuse to do his work. He can not collect wages for his employment, and, at the same time, engage in activities to injure or destroy his employer's business. 'It was implied in the contract of hiring that these employees would do the work assigned to them in a careful and workmanlike manner; that they would comply with all reasonable orders and conduct themselves so as not to work injury to the employer's business; that they would serve faithfully and be regardful of the interests of the employer during the term of their service, and carefully discharge their duties to the extent reasonably required. * * * While these employees had the undoubt-

ed right to go on a strike and quit their employment, they could not continue to work and remain at their positions, accept the wages paid to them, and at the same time select what part of their allotted tasks they cared to perform of their own volition, or refuse openly or secretly, to the employer's damage, to do other work.' National Labor Relations Board v. Montgomery Ward & Co., Inc., [8 Cir., 1946, 157 F.2d 486, 496]." Hoover Co. v. N. L. R. B., 6 Cir., 1951, 191 F.2d 380, 389. See 346 U.S. at page 475, 74 S.Ct. 172.

I believe that to be a correct statement of the law, and I suspect that the Supreme Court thinks so, too. In National Labor Relations Board v. Local Union No. 1229, International Brotherhood of Electrical Workers, supra, the Court said, 346 U.S. at page 476, 74 S.Ct. at page 178: "Nothing could be further from the purpose of the Act than to require an employer to finance such activities. Nothing would contribute less to the Act's declared purpose of promoting industrial peace and stability." (And see footnote 12.)

The majority say that the conduct described in its order may not be considered as "evidence" that the union failed to bargain collectively in good faith, although there is no slightest suggestion that the facts failed to justify the findings, nor could there be in the light of the concession made to us. The majority lay aside the threats of reprisals, the blocking of ingress by cars into the plant by the shop chairman and various other coercive conduct which "the union does not contest." But the Board was charged with the duty of ascertaining "good faith" on the whole record. The various types of conduct disclosed made up that record. "Not only are the findings of the Board conclusive with respect to questions of fact in this field when supported by substantial evidence on the

---

[1.] The union in its brief expressed the belief that this case can "be disposed of without reaching the issue as to whether such activities are unprotected," but contends that the tactics "are protected by § 7 of the Act." But see International Union of United Automobile Aircraft & Agricultural Implement Workers of America v. O'Brien, 1950, 339 U.S. 454, 459, 70 S. Ct. 781, 94 L.Ed. 978.

record as a whole, but the Board's interpretation of the Act and the Board's application of it in doubtful situations are entitled to weight. In the views of the Board as applied to this case we find conformity with the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 1951, 341 U.S. 675, 691, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284. Granted the Court was there dealing with a § 8(b) (4) (A) case, the principle seems to me controlling here. We are not even confronted by a conflict in the evidence, for the union conceded it had ordered the use of the tactics to enforce its demands, nor is an issue raised with respect to the other coercive conduct. Our role in such situations has "special applicability to cases where, as here, a statutory standard such as 'good faith' can have meaning only in its application to the particular facts of a particular case." National Labor Relations Board v. American Nat. Ins. Co., supra, 343 U.S. at page 410, 72 S.Ct. at page 832. "We think the Board had full authority to determine as a fact whether petitioner was acting in good faith or whether its actions amounted to a mere superficial pretense at bargaining,—whether it had actually the intent to bargain, sincerely and earnestly,—whether the negotiations were captious and accompanied by an active purpose and intent to defeat or obstruct real bargaining. [Citing cases.]" Singer Mfg. Co. v. N. L. R. B., 7 Cir., 1941, 119 F.2d 131, 134, certiorari denied, 1941, 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549, rehearing denied, 1941, 314 U.S. 708, 62 S.Ct. 55, 86 L.Ed. 565.

I would deny the petition to set aside the Board's order and would grant the Board's petition for enforcement.