**OLIN MATHIESON CHEMICAL CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 7127.

United States Court of Appeals
Fourth Circuit.

Argued March 20, 1956.

Decided April 9, 1956.

William A. Stuart, Abingdon, Va. and H. W. Stull, Washington, D. C., for petitioner.

Owsley Vose, Atty., National Labor Relations Board (Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman, Atty., National Labor Relations Board, on brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This case is before us upon the petition of the Olin Mathieson Chemical Corporation (hereinafter called Olin) to review and set aside an order of the National Labor Relations Board (hereinafter called the Board) issued against petitioner and Mathieson Chemical Corporation, its predecessor in interest, on October 18, 1955, following the usual proceedings under Sections 9 and 10 of the National Labor Relations Act, 61 Stat. 136, 29 U.S.C.A. § 151 et seq. (hereinafter called the Act). In its answer to the petition, the Board has requested enforcement of its order.

The Board's order required Olin to cease and desist from the unfair labor practices found, or from in any other manner interfering with, restraining, or coercing its employees in the exercise of their statutory rights. Affirmatively, Olin was required to reinstate the unlawfully laid-off employees and make them whole for any loss of pay they may have suffered as a result of the discrimination againt them; to rescind its discriminatory seniority policy and to restore all employees affected thereby to the seniority they would have enjoyed absent such discriminatory policy; upon request, to bargain with the Unions with respect to the units of which they are the respective certified representatives; and to post appropriate notices.

Two questions are presented to us:

(1) Whether the Board properly found that the Company violated Section 8(a) (3) and (1) of the Act by changing its seniority policy after a strike to give preference to nonstrikers and to employees who had returned to work during the strike, and by laying off seven employees pursuant to its new policy.

(2) Whether the Board properly found that the Company violated Section 8(a) (5) and (1) of the Act by refusing to bargain collectively in good faith with the Unions.

The Board found, in agreement with the Trial Examiner, that Olin changed its seniority policy after the strike so as to give preference to employees who had worked during the strike in order to discipline employees adhering to the strike until the very end and that Olin's action in this regard, and its further action, pursuant to its new policy, in laying off seven employees who would not have been laid off under Olin's former seniority policy, was violative of Section 8(a) (3) and (1) of the Act. The Board further found, upon the basis of the entire course of the bargaining, and particularly, in view of the Company's insistence upon superseniority for nonstrikers or returning strikers, that the Company, therefore, had refused to bargain collectively in good faith in violation of Section 8(a) (5) and (1) of the Act.

In 1952, the Unions were certified by the Board as the bargaining representatives of the employees. Thereafter, Olin entered into collective bargaining agreements with the Unions, which were to expire February 10, 1954. No new

agreements were effected before the strike on February 24, 1954.

We think we must uphold these findings of the Board, that we must deny Olin's petition to set aside the order of the Board, and that the Board's petition to enforce its order must be granted.

 Section 8(a) (3) of the Act forbids an employer by discrimination in regard to hire and tenure of employment to discourage membership in any labor organization. The protection of Section 8(a) (3) extends to "all elements of the employment relationship which in fact customarily attend employment and with respect to which an employer's discrimination may as readily be the means of interfering with employees' right of self-organization as if these elements were precise terms of a written contract of employment." National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 218, 60 S.Ct. 493, 500, 84 L.Ed. 704. Moreover, Olin's superseniority policy is in conflict with Section 13 of the Act, providing that "Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike * * *." 29 U.S.C.A. § 163. As was said in the *per curiam* opinion in Republic Steel Corporation v. National Labor Relations Board, 3 Cir., 114 F. 2d 820, 821: "We think it was the intention of the Board, as it was of this court, to provide that upon reinstatement the striking employees were to be treated in all matters involving seniority and continuity of employment as though they had not been absent from work." See, also, National Labor Relations Board v. Industrial Cotton Mills, 4 Cir., 208 F.2d 87, 45 A.L.R.2d 880, certiorari denied 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086; Home Beneficial Life Insurance Co. v. National Labor Relations Board, 4 Cir., 159 F.2d 280, certiorari denied 332 U.S. 758, 68 S.Ct. 58, 92 L.Ed. 344.

Olin does not dispute the fact that the promulgation and implementation of its superseniority policy was discriminatory in favor of employees abandoning or not participating in the strike and against those remaining on strike until it was called off. Nor does Olin deny that its action discouraged union activities. Olin's contention is twofold. First, relying on the Mackay Radio decision of the Supreme Court, National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381, Olin contends that it was permissible, as a measure necessary to "protect and continue" its business, for it to replace the strikers with new employees, and hence it was proper (since the greater includes the less) for it to take the not so drastic action of depriving the strikers of seniority for layoff purposes in order to accomplish this same objective. Second, Olin contends that its conduct is sanctioned by the decision of the Ninth Circuit in the case of National Labor Relations Board v. Potlatch Forests, Inc., 189 F.2d 82.

The Mackay decision merely holds that an employer need not displace employees hired during an economic strike to make room for returning strikers. And, in the opinion in that case, Mr. Justice Roberts went on to say, 304 U.S. at pages 345–346, 58 S.Ct. at page 910:

"Nor was it an unfair labor practice to replace the striking employees with others in an effort to carry on the business. Although section 13 of the act, 29 U.S.C.A. § 163, provides, 'Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike,' it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by respondent to those who accepted employment during the strike

that if they so desired their places might be permanent was not an unfair labor practice nor was it such to reinstate only so many of the strikers as there were vacant places to be filled."

But the situation before us is quite different. The strike was over, the strikers had returned to work. The Olin plant was in full operation. No promise, when they were employed, was made to the employees who remained at work during the strike, or who returned to work before the end of the strike, that their employment would be permanent. Olin, after the strike, when there was no necessity for such action to keep its plant in operation, promulgated its superseniority policy in favor of the so-called "loyal employees" and against those who returned to work after the strike had failed and was over. Olin was clearly penalizing the strikers for exercising their right to strike and was thereby clearly discouraging any exercise of this right in the future. This, we think, Olin cannot lawfully do. Olin's attorney, Stull, admitted in one of the conferences with Union representatives that Olin's insistence on the superseniority plan was motivated by Olin's preference for the employees who had been loyal to Olin by helping to break the strike, and also Olin's concern that the plant be not "shut down again."

The 7 employees unlawfully discharged were part of some 94 maintenance men laid off pursuant to Olin's new policy. These 7 had not worked during the strike but they had been hired by Olin prior to a corresponding number of retained employees who had worked during the strike.

It is quite obvious that Olin's application of the superseniority policy here tended to discourage future strikes. Said Mr. Justice Reed, in Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. National Labor Relations Board, 347 U.S. 17, 45, 74 S.Ct. 323, 338, 98 L.Ed. 455: "Thus an employer's protestation that he did not intend to encourage or discourage must be unavailing where a natural consequence of his action was such encouragement or discouragement."

Olin relies heavily upon the Potlatch case, supra, and there is much in Circuit Judge Orr's opinion that lends support to Olin's contention. The only important factual difference between Potlatch and our case seems to be "Potlatch advocated 'strike seniority' before the strike was settled, adopted that policy at the time of settlement and has consistently maintained that policy at all times thereafter." 189 F.2d at page 86. There was also doubt expressed in Judge Orr's opinion as to the motivation in applying the superseniority clause. Said Judge Orr, 189 F.2d at page 86: "In the instant case, therefore, the 'discrimination' between replacements and strikers is not an unfair labor practice despite a tendency to discourage union activities, because the benefit conferred upon the replacements is a benefit reasonably appropriate for the employer to confer in attempting 'to protect and continue his business by supplying places left vacant by strikers.'" In our case, the replacements seem all to have been old employees; in Potlatch, the replacements included both old and new employees.

From Judge Orr's opinion, we quote further, 189 F.2d at page 86:

"The record here does not disclose that Potlatch in fact assured the replacements that 'their places might be permanent'; however, that assurance need not be proved. The Supreme Court in the Mackay Radio case was concerned not so much with an explicit promise of permanent tenure as with the propriety of the employer's concern for that tenure."

With this, we disagree. With a strike in progress, the primary concern of the employer is to keep his plant in operation. It is then proper for an employer, who might be unable to procure replacement save upon a promise of permanent tenure, to promise such tenure to the replacements. But when the strike is over, when the plant is in operation, then

the imposition of the superseniority policy in favor of the replacements and against the strikers is quite a different matter. That is the case before us. There is nothing in the record here to show that, at the time Olin secured these replacements for the strikers, Olin made any promise of permanent tenure to these replacements. And we do not read the Mackay case as condoning this conduct on the part of Olin.

When it became apparent to the Unions that the strike was lost, they sought to resume negotiations with Olin. Olin's response was that they should make their proposals through the Federal Mediation and Conciliation Service. Finally, after delaying answering the Union's letter of March 23 formally requesting a bargaining meeting, Olin arranged a meeting on April 2. At this meeting Olin, while offering to sign contracts with the Unions containing all provisions previously agreed to, demanded that the Unions agree to the incorporation in the seniority clause of the superseniority policy adopted after the strike. Despite the Unions' objections to this proposal, Olin a few days later nevertheless, and without further consultation with the Unions, effected a layoff in accordance with this policy.

Olin shortly thereafter refused to meet with the Unions, stating that if the Unions had any proposals to make they should be submitted in writing. When the Unions subsequently submitted such proposals in writing, including a decreased wage demand, Olin rejected them, stated that it would not recede from its superseniority policy or from its refusal to grant a wage increase, and refused to meet further with the Unions on the ground that such action would be "futile".

The parties again met about ten months later, and although they were in agreement on all other issues, Olin still insisted on the incorporation of its superseniority policy in the contract. Although the Unions argued that this clause was illegal and that the decision on this issue should be held in abeyance until the Board had had a chance to pass on the question—and even offered to amend the proposed agreement to include this provision if the Board upheld its legality—Olin nevertheless persisted in its demand for the inclusion of this provision in the agreement.

On these facts we must uphold the Board's finding that Olin violated Section 8(a) (5) and (1) of the Act by refusing to bargain collectively in good faith with the Unions.

It seems only fair to state that the record shows no past background of hostility towards the Unions on the part of Olin. Nor was there here any discrimination between employees who did belong to the Unions and those who did not; for all the employees involved were Union men.

For the reasons stated, we must decree enforcement of the Board's order requiring Olin to reinstate the employees unlawfully laid off under the superseniority policy and to make them whole for any loss of pay suffered; to rescind its discriminatory policy; to bargain collectively in good faith with the Unions; and to post appropriate notices.

Order of the Board enforced.

SOPER, Circuit Judge (dissenting).

The opinion of the court is in direct conflict with that of the Ninth Circuit in N. L. R. B. v. Potlatch Forests, 189 F.2d 82, which is not distinguishable in any essential feature, and presents in my opinion a reasonable approach to the problem under consideration. I base this dissent on the following passage from that opinion: at page 86.

"In the instant case, therefore, the 'discrimination' between replacements and strikers is not an unfair labor practice despite a tendency to discourage union activities, because the benefit conferred upon the replacements is a benefit reasonably appropriate for the employer to confer in attempting 'to protect and continue his business by supplying places left vacant by strikers.'

Hence, we think the specific question posed here has been answered by the Supreme Court by recognizing that an employer attempting to fill a number of positions must be able to offer a substantial degree of security (as well as attractive wages), and that an employer may properly assure the replacements that 'their places might be permanent.' If there are not enough jobs to go around at the time the strike is settled the rights of replacements prevail over strikers.

"While the Mackay Radio case [304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381] can be formally distinguished on the ground that the Supreme Court in that case was considering a shortage of jobs at the time the strike was settled, rather than a shortage caused by a later curtailment of activities the assurance of permanent employment in the latter event is equally justifiable."