303 F.2d 359
 INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, LOCAL 613, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
ERIE RESISTOR CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 13695.
 No. 13700.
 United States Court of Appeals Third Circuit.
 Argued January 26, 1962.
 Decided May 15, 1962.
 
 John G. Wayman, Pittsburgh, Pa. (Irving Olds Murphy, Gifford, Graham, MacDonald & Illig, Erie, Pa., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for petitioner Erie Resistor Corp.
 David S. Davidson, Washington, D. C. (Benjamin C. Sigal, Winn I. Newman, Washington, D. C., on the brief), for International Union of Electrical, Radio, & Machine Workers, Local 613, AFL-CIO.
 Melvin Welles, Washington, D. C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Marion L. Griffin, Attorney, National Labor Relations Board, on the brief), for appellee.
 Before KALODNER, STALEY and SMITH, Circuit Judges.
 WILLIAM F. SMITH, Circuit Judge.
 
 
 1
 This case is before the Court upon petitions for review filed by the Erie Resistor Corp. (the Company), and Local 613, I.U.E., AFL-CIO (the Union), and a cross-petition filed by the National Labor Relations Board (the Board) for the enforcement of its final order. These petitions were filed under Sections 10 (f) and (e) of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 160 (f) and (e). The essential facts are not in dispute and the jurisdiction of this Court is conceded.
 
 
 Facts
 
 
 2
 The Company maintained a manufacturing plant at Erie, Pennsylvania where it was engaged in the manufacture and sale of electronic components, electro-mechanical assemblies, and custom molded plastics. The production and maintenance workers of the Company were, and had been since 1951, represented by the Union. There had been in force and effect successive collective bargaining agreements, the last of which was terminated on March 31, 1959.
 
 
 3
 Approximately two months prior to the termination of the then existing agreement, the Union notified the Company of its desire to enter into negotiations in anticipation of a new contract. The negotiators for the respective parties met from time to time thereafter but were unable to reach full agreement. When the existing agreement terminated on March 31, 1959, a strike was called. It is here admitted that at its inception the strike was economic. When the strike was called there were 478 production and maintenance workers actively employed and 450 on layoff status; of those on layoff status, approximately 400 had no reasonable expectation of being recalled. All of the workers actively employed joined the strike.
 
 
 4
 The Company attempted to maintain production operations during the month of April by using clerical employees and other personnel outside the bargaining unit. Production declined to a level between 15% and 30% of normal, and several customers cancelled their orders with the Company. On May 3, 1959, each of the strikers was notified by letter that the Company intended "to obtain replacements"; they were further notified that they would hold their positions only until replaced. The hiring of replacements commenced on May 11, and continued thereafter until June 24, 1959. The replacements included new employees, employees on layoff status, and returning strikers. When the applicants were accepted they were told that they would not be laid off or discharged by reason of the settlement of the strike.
 
 
 5
 When the negotiators met on May 11, 1959, the representatives of the Union were informed that replacements were being assured that they would not be discharged upon settlement of the strike. The Company, prompted by a desire to implement its assurances, proposed that the existing seniority system be so modified as to accord the replacements some form of preferential seniority. The Company offered to consider any plan acceptable to the Union, but the offer was rejected. The subject was discussed at five sessions held between May 11th and May 28th. The representatives of the Union remained adamant in their refusal to consider it on the ground that a preferential seniority system would be discriminatory and illegal.
 
 
 6
 On May 27, 1959, the Company formulated a preferential seniority plan under which twenty years were added to the regular length of service of all production and maintenance workers who accepted employment during the strike. The plan was limited in its application to future layoffs and recalls from layoff. The Union was informed of the plan on the following day and publicized it in radio and television broadcasts on May 30th and 31st. The strikers were informed by letter addressed to each of them by the Company on June 10th; copies of the plan were posted on the company bulletin boards on June 15th. Notwithstanding the formulation of a preferential seniority policy, the Company expressed a willingness to consider any alternative plan proposed by the Union.
 
 
 7
 The strike ended on June 25, 1959, after the Union withdrew the picket line and offered to submit the seniority issue to the Board. Thereafter the strikers who had not been replaced were recalled by the Company in the order of seniority. By July 5th, 358 production and maintenance workers had returned to work; this number increased to 442 by September 20th. Thereafter, between September of 1959 and May of 1960, 202 employees were laid off for economic reasons; many of these were recalled strikers whose seniority was insufficient only because of the operation of the preferential seniority plan.
 
 
 Decision and Order of the Board
 
 
 8
 The Trial Examiner concluded that under the applicable decisions a preferential seniority policy cannot be held illegal in the absence of proof that its adoption was prompted by a wrongful motive. He found that the evidence was "wholly inadequate" to support a factual determination that the adoption of the preferential seniority policy here in question was prompted by an illegal motive, and recommended dismissal of the complaint. The Board rejected the conclusion of the Trial Examiner and held "that superseniority HOWEVER MOTIVATED [is] an illegal discrimination against strikers."[1] (Emphasis by this Court).
 
 
 9
 The Board found: first, that the preferential seniority policy was inherently discriminatory and that its adoption was an unfair labor practice within the meaning of Sections 8(a) (3) and (1) of the Act, 29 U.S.C.A. § 158(a) (3) and (1); second, that the layoff of recalled strikers was discriminatory and violated the said sections; third, that the Company's insistence upon a preferential seniority plan as a condition to settlement was tantamount to a refusal to bargain and an unfair labor practice within the meaning of Section 8(a) (5) of the Act, 29 U.S.C.A. § 158(a) (5); and fourth, that the said conduct converted the strike into an unfair labor practice strike as of May 29, 1959, and, therefore, the refusal to reinstate all strikers upon termination of the strike was likewise a violation. The order directed the Company to cease and desist from the practices found to be illegal, and to take affirmative action consistent with the Board's decision.
 
 
 Discussion
 
 
 10
 We concede that the application of a preferential seniority policy may be discriminatory and may tend to discourage union membership. The narrow question before us for decision is whether such a policy HOWEVER MOTIVATED is illegal.
 
 
 11
 An employer in the ordinary management of his affairs may be required to make business decisions discriminatory in their probable consequences. Such discrimination is not in and of itself illegal. The discrimination proscribed by Section 8(a) (3) as an unfair labor practice is that which is motivated by a desire "to encourage or discourage membership in any labor organization."
 
 
 12
 The Supreme Court has consistently held that the discriminatory conduct of an employer is not unlawful in the absence of an illegal motive. Local 357, Intern. Broth. of Teamsters, etc. v. National Labor Relations Board, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961); Radio Officers', etc. v. National Labor Relations Board, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954); National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937). The Court has adhered to the view that motivation is a relevant factor and the test of the employer's conduct. Ibid.
 
 
 13
 The case of Local 357, Intern. Broth. of Teamsters, etc. v. National Labor Relations Board, supra, is pertinent. The matter came before the Board on a complaint which charged that an exclusive hiring agreement between an employer and a union violated Section 8(a) (3) and (1). The agreement was held illegal on the ground that it inherently and unlawfully encouraged union membership.[2] The decision of the Board was sustained by the Court of Appeals.[3] The decision of the Court of Appeals was reversed by the Supreme Court. While the ultimate decision of the latter Court appears to rest on other grounds, the majority opinion reiterates that "[i]t is the `true purpose' or `real motive' in hiring or firing that constitutes the test." Local 357, Intern. Broth. of Teamsters, etc. v. National Labor Relations Board, supra, 365 U.S. at page 675, 81 S.Ct. at page 839.
 
 
 14
 The relevance of motive as a determinative factor is discussed at length in the concurring opinion of Mr. Justice Harlan, with whom Mr. Justice Stewart concurred, 365 U.S. 667, 677-685, 81 S.Ct. 835, 6 L.Ed.2d 11. It is therein stated, at page 679, 81 S.Ct. at page 841:
 
 
 15
 "What in my view is wrong with the Board's position in these cases is that A MERE SHOWING OF FORESEEABLE ENCOURAGEMENT OF UNION STATUS IS NOT A SUFFICIENT BASIS FOR A FINDING OF VIOLATION of the statute. It has long been recognized that an employer can make reasonable business decisions, UNMOTIVATED BY AN INTENT TO DISCOURAGE UNION MEMBERSHIP OR PROTECTED CONCERTED ACTIVITIES, although the foreseeable effect of these decisions may be to discourage what the act protects." (Emphasis by this Court.)
 
 
 16
 Mr. Justice Harlan went on to say, at page 680, 81 S.Ct. at page 842: "In general, this Court has assumed that a finding of a violation of § 8(a) (3) or § 8(b) (2) requires an affirmative showing of a motivation of encouraging or discouraging union status or activity."
 
 
 17
 We are of the opinion that Radio Officers', etc. v. National Labor Relations Board, supra, lends support to our point of view.[4] We refer particularly to N. L. R. B. v. Gaynor News Co., 347 U.S. 17, 34, 74 S.Ct. 323, 98 L.Ed. 455. Therein the employer and the union were parties to an agreement under which the union was recognized as the exclusive bargaining agent for both union and nonunion employees. Pursuant to the terms of a supplementary agreement, retroactive wage increases were granted to union employees but denied non-union employees; gratuitous vacation benefits were granted and denied on the same basis.
 
 
 18
 The matter came before the Board[5] on a complaint which charged the employer and the union with a violation of Sections 8(a) (3) and (1). The only answer offered by the employer was that the retroactive wage payments and gratuitous benefits had been paid under the compulsion of a legally binding contract. The Board concluded, as did the Trial Examiner, that the contract afforded no defense to the charge. We agree with this conclusion. The Board held that the disparate treatment of the employees on the basis of union membership foreseeably encouraged union membership and was therefore a violation of the pertinent sections under which the employer and the union were charged.
 
 
 19
 The view of the Board was sustained by the Supreme Court, which held that the evidentiary facts, absent proof of a valid business reason, were sufficient to support an inference that the disparate treatment of the employees was intended to encourage union membership. The Court said, at page 46, 74 S.Ct. at page 339: "No more striking example of discrimination so foreseeably causing employee response as to obviate the need for any other proof of intent is apparent than the payment of different wages to union employees doing a job than to non-union employees doing the same job."
 
 
 20
 The Court held, at page 47, 74 S.Ct. at page 339, "that in the circumstances of this case, the union being exclusive bargaining agent for both member and nonmember employees, the employer could not, without violating § 8(a) (3), discriminate in wages solely on the basis of such membership even though it had executed a contract with the union prescribing such action. Statements throughout the legislative history of the National Labor Relations Act emphasize that exclusive bargaining agents are powerless `to make agreements more favorable to the majority than to the minority.' Such discriminatory contracts are illegal and provide no defense to an action under § 8(a) (3)."
 
 
 21
 The Supreme Court held: "that specific evidence of intent to encourage or discourage is not an indispensable element of proof of violation of § 8(a) (3),"[6] but it did not disregard motivation as a relevant factor. The Court said:
 
 
 22
 "The relevance of the motivation of the employer in such discrimination has been consistently recognized under both § 8(a) (3) and its predecessor. In the first case to reach the Court under the National Labor Relations Act, [National] Labor [Relations] Board v. Jones & Laughlin Steel Corp., 301 U.S. 1 [57 S.Ct. 615, 81 L.Ed. 893], in which we upheld the constitutionality of § 8(3), we said with respect to limitations placed upon employers' right to discharge by that section that `the [employer's] true purpose is the subject of investigation with full opportunity to show the facts.' Id., at 46 [57 S.Ct. at 628]. In another case the same day we found the employer's `real motive' to be decisive and stated that `the act permits a discharge for any reason other than union activity or agitation for collective bargaining with employees.'" Radio Officers' etc. v. National Labor Relations Board, supra, 347 U.S. at page 43, 74 S.Ct. at page 337.
 
 
 23
 It was established by National Labor Relations Board v. Mackay Radio & Telegraph Co., supra, that an employer, TO PROTECT AND CONTINUE HIS BUSINESS, may replace strikers during the strike and assure the replacements that their employment will not be terminated upon settlement of the strike. Such a replacement policy is obviously discriminatory and may tend to discourage union membership. The presence of these factors in and of themselves do not render the policy illegal. The test of its legality is the true purpose, or real motive, of the employer. This was clearly the test applied by the Court in the cited case. Ibid. The rationale of the Mackay case is pertinent in the instant case.
 
 
 24
 We direct our attention to N. L. R. B. v. California Date Grow. Ass'n, 259 F.2d 587 (9th Cir. 1958), and Olin Mathieson Chem. Corp. v. N. L. R. B., 232 F.2d 158, 159 (4th Cir. 1956). The question before the Court in these cases was the legality of a preferential seniority policy. It was found in each case that there was no evidence that the policy was adopted to protect and continue the business. The respective Courts decided that the policies were motivated by a desire to discourage union activities. It should be noted that both Courts applied the test of real motive. The decisions recognize that a preferential policy would be proper under appropriate circumstances.
 
 
 25
 We reject as unsupportable the rationale of the Board that a preferential seniority policy is illegal however motivated. We are of the opinion that inherent in the right of an employer to replace strikers during a strike is the concomitant right to adopt a preferential seniority policy which will assure the replacements some form of tenure, provided the policy is adopted SOLELY to protect and continue the business of the employer. We find nothing in the Act which proscribes such a policy. Whether the policy adopted by the Company in the instant case was illegally motivated we do not decide. The question is one of fact for decision by the Board.
 
 
 26
 The additional question raised in the petition for review filed by the Union is rendered moot by our decision; we therefore see no reason to discuss it.
 
 
 27
 The cross-petition for enforcement will be denied.
 
 
 
 Notes:
 
 
 [1]
 This was admittedly the rationale of the Board in the Matter of Potlatch Forests, Inc., et al., 87 NLRB 1193 (1949). See Decision and Order of the Board, Joint Appendix 10a. This rationale was rejected, and enforcement of the Board's Order was denied by the Court of Appeals. N. L. R. B. v. Potlatch Forests, 189 F.2d 82 (9th Cir. 1951)
 
 
 [2]
 Los Angeles-Seattle Motor Express, Incorporated, et al., 121 NLRB 1629 (1958); see also Mountain Pacific Chapter, etc., 119 NLRB 883 (1957)
 
 
 [3]
 Local 357, International Brotherhood, etc. v. N. L. R. B., 107 U.S.App.D.C. 188, 275 F.2d 646 (1960)
 
 
 [4]
 Three cases were consolidated for hearing and disposition
 
 
 [5]
 Gaynor News Co. Inc., et al., 93 NLRB 299 (1951)
 
 
 [6]
 We recognize, as did the Supreme Court in the cited case and in other cases, the right of the Board to draw an inference of unlawful motive in the absence of evidentiary facts to support an inference to the contrary