**NATIONAL LABOR RELATIONS BOARD**

v.

**INDUSTRIAL COTTON MILLS (DIVISION OF J. P. STEVENS CO.).**

No. 6635.

United States Court of Appeals Fourth Circuit.

Argued Oct. 20, 1953.

Decided Nov. 9, 1953.

Bernard Dunau, Atty., N. L. R. B., Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Lewis C. Green, Atty., N. L. R. B., Washington, D. C., on brief), for petitioner.

Whiteford S. Blakeney, Charlotte, N. C. (Pierce & Blakeney, Charlotte, N. C., on brief), for respondent.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and WILKIN, District Judge.

DOBIE, Circuit Judge.

This case is before us upon the petition of the National Labor Relations Board (hereinafter called the Board) for the enforcement of its order issued against Industrial Cotton Mills, Incorporated, (hereinafter called Industrial), February 11, 1953.

Only two questions are involved in this appeal: (1) Whether substantial evidence in the record supports the Board's finding that Industrial denied reinstatement to employee, Lewis Williams, because he elected to remain on strike rather than to accept Industrial's invitation to return to work; and (2) Whether an unreplaced striker may be denied his right to reinstatement because the employer grounds his refusal to recall him on the mistaken but sincere belief that the employee's strike activity was marred by misconduct.

In 1951, the Union was the recognized collective bargaining agent at respondent's Rock Hill, South Carolina plant, representing a production and maintenance unit of 1,057 employees. On April 2, 1951, as a result of a dispute over contract terms, the employees went out on strike. Substantially all the employees in the unit joined this strike, and for a time the plant was completely shut down. About July 17, 1951, respondent was able to resume partial operations on one shift. At that time, some of the employees returned to work, and respondent wrote all of the remaining employees asking them to return to work. The Union capitulated about August 20, 1951, and the great bulk of the employees ended their strike, and sought and obtained reinstatement.

### Lewis Williams.

Industrial vigorously denied that its refusal to reinstate Williams was by way of reprisal for his refusal to return to work during the strike when he was so invited by Industrial. For its refusal to reinstate Williams, Industrial advanced three reasons: (1) his physical disability; (2) his record of absenteeism; and (3) introduction of new machinery and a change in mechanical operations at the mill.

The Board concluded that the real reason for Industrial's refusal to reinstate Williams was his election to remain out on strike rather than to accept respondent's invitation to return to work, and that the reasons advanced by respondent were pretexts to conceal its discriminatory action.

We must agree with the Board's finding, which is supported by substantial evidence in the record, that excuse (2) (absenteeism) and excuse (3) (change in mechanical operation) are not real and valid excuses which can justify Industrial's refusal to reinstate Williams. We think, however, that the Board's conclusion that excuse (1) was a pretext is not based on substantial evidence but that this, not the refusal of Williams to return to work during the strike, was the actual, and a valid reason for refusing reinstatement to Williams. We must, accordingly, deny the enforcement of the Board's order relating to Williams.

Williams had long been afflicted with disabling arthritis, which confined him to a hospital for several weeks in early 1951. When he returned to work, Industrial so arranged his job as a card-grinder that the difficult and heavy work incident to such employment was done by another employee, Rollins, while Williams did only that part of his tasks as card-grinder which was light and easy. Certainly, that was an anomalous situation in the mill of Industrial, or in any other textile mill.

When the strike, which had lasted four months, was over and Williams reported to work, Industrial sent him to its doctor, a reputable physician in Rock Hill, for a report on the physical condition of Williams. This doctor, after examining Williams, reported to Industrial that Williams had a disability which was "substantial total." Whereupon, Industrial declined to reemploy Williams. T. B. Jackson, a representative of Industrial's management, testified:

> "We go by what our doctors—We pay these doctors to examine these people and we go by their word. If they say they are not able to work— that is done every day in the week —if they say they are not able to work we don't employ them."

There was no evidence that Industrial, in the case of employees other than Williams, had varied from this custom.

Industrial, at the hearing before the Board's Trial Examiner, stated: "The Company is entirely willing to have Mr. Williams in its employment provided he can competently run his job according to the Company's ordinary standards, and provided he can do so in reasonable safety to himself and other employees;" and that if a reputable physician could upon examination report to the Company that Williams was able to handle a card-grinding job, then the Company would give him the first opening in such a job. If the purpose and intent of Industrial had been that it was unwilling to have Williams in its employment by virtue of his Union activity or because he had refused to return to work during the strike, we hardly think Industrial would have made this offer. And this seems to us none the less true because the offer was made after the instant proceedings against Industrial had been instituted.

Williams, by his own account, apart from being a member of the Union, along with most of the other employees of Industrial, never had anything "to do with" the Union beyond "just membership" and never engaged in picketing or Union or concerted activities in any way whatever. Yet the Board found that Industrial, passing over hundreds of other employees who likewise went out on strike and who like Williams also refused to return to work during the strike, but who, unlike Williams, did actively engage in picketing and strike activities, and passing over *all* the committeemen, officers and leaders in the Union and in the strike, discharged solely this lowly, crippled card-grinder by way of reprisal. We think this finding is quite unreasonable and finds no substantial support in the evidence.

### Matthew Stallings.

The case of Stallings presents an interesting and important question of law.

Stallings had been employed as a card tender for about five years. He joined the strike at its beginning, and took part in the picketing. On July 31, dur-

ing the strike, Stallings was standing among a group of people on a street corner near the plant. After he had been standing there about half an hour, two policemen (Arve and Wilson) emerged from the plant and approached Stallings. They accused him of having thrown tacks on the street, and asked him whether he had seen tacks thrown by anyone else. Stallings denied throwing any tacks, and answered that he had not seen any tacks thrown. His testimony to this effect was corroborated by a disinterested witness not connected with the strike, Lucy Starnes.

The policemen did not formally place Stallings under arrest, or take him down to the police station, as they had done in the cases of employees Aiton and Crouch, whom they had apprehended in the act of throwing and setting up tacks in the street. Instead, Stallings was released from custody at the plant. He was never served with a warrant, as were Aiton and Crouch. Nor was he ever brought to trial for a misdemeanor, as was Crouch.

When Stallings applied for reinstatement at the conclusion of the strike, Industrial refused to hire him on the ground that he had thrown tacks into the street. Industrial did not contend that Stallings had been replaced during the strike or that his former job was no longer available.

The Board found that Industrial had an "honest belief" that Stallings had engaged in such strike misconduct. The Board further found, however, that Stallings was innocent of the misconduct attributed to him in connection with the strike. The Board concluded that an unreplaced striker is entitled to reinstatement; that this right is not subject to defeasance by the employer's mistaken belief that the striker has misconducted himself in connection with the strike; and that Stallings' denial of reinstatement, based on respondent's mistaken belief that he had engaged in strike misconduct, constituted a violation of Section 8(a) (1) and (3) of the National

Labor Relations Act, 29 U.S.C.A. § 158 (a) (1, 3).

We must uphold, as based on substantial evidence, the Board's finding that Stallings was innocent of the alleged strike misconduct. The Board found the testimony of the two policemen, Arve and Wilson, vague, inconsistent and "not such as to invite credence." The Board declined to believe the two policemen and did believe Stallings and his corroborating witness, Starnes.

■ Here is a resolution of conflicting testimony, involving a question of credibility, which is binding on us. See, National Labor Relations Board v. Dinion Coil Co., 2 Cir., 201 F.2d 484, 486–490; National Labor Relations Board v. Southland Manufacturing Co., 4 Cir., 201 F.2d 244. We must also sustain the Board's finding that Industrial had an "honest belief", though an erroneous one, that Stallings had been guilty of the alleged strike misconduct.

It is conceded by counsel for both Industrial and the Board that if Industrial had refused reinstatement to Stallings on the honest but mistaken belief that Stallings had been guilty of some crime, such as arson or robbery, entirely disconnected with the strike, the Union or concerted activity of the employees, then the Board could not order his reinstatement. Such conduct is without the ambit and beyond the purview of the National Labor Relations Act (hereinafter called the Act), 29 U.S.C.A. § 151 et seq.

■ The question then remains whether the Board has the power to order the reinstatement of Stallings when his employer has refused reinstatement to him after the strike on account of the employer's honest but mistaken belief that Stallings had been guilty of *strike misconduct*. By the term "strike misconduct," we mean, broadly, misconduct arising out of, developed by, or closely connected with, the strike. The Board, correctly we think, answered this question in the affirmative.

Congress has, in no uncertain terms, very carefully safeguarded the exercise by employees of concerted activities and has expressly recognized their right to strike. National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, 672, 71 S.Ct. 961, 95 L.Ed. 1277; International Union U. A. W. v. O'Brien, 339 U.S. 454, 457, 70 S.Ct. 781, 94 L.Ed. 978. Section 2(3) of the Act preserves to strikers their status of employees and Section 13 provides: "Nothing in this Act, except as specifically provided for herein, shall be construed so as * * * to interfere with or impede or diminish in any way the right to strike".

■ The law is quite clear that, apart from strike misconduct, (and certain other situations not applicable here, see National Labor Relations Board v. Mackay Radio and Telegraph Co., 304 U.S. 333, 347, 58 S.Ct. 904, 82 L.Ed. 1381), the refusal of an employer to reinstate a striker, whose place has not been filled, constitutes a violation of Section 8(a) (1) and (3), and equally clear is the right of the employer to refuse reinstatement when the striker has actually been guilty of serious strike misconduct. See the elaborate opinion (and cases therein cited) of Circuit Judge Soper, speaking for our Court, in Home Beneficial Life Insurance Co. v. National Labor Relations Board, 4 Cir., 159 F.2d 280, 284, 285, certiorari denied 332 U. S. 758, 68 S.Ct. 58, 92 L.Ed. 344; National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 130 F.2d 919, 927–928.

■ As we view the situation, the statutory protection extended to a blameless employee is a firm and clear guarantee, not one which constantly varies with the correctness of the employer's opinion or with accuracy of his sources of information. Nor does the Act expose the innocent employee to the hazard of his employer's mistake where the consequence of this mistake is to divest the employee of a right guaranteed by the Act.

The right to reinstatement granted to a blameless unreplaced striker is designed to set the limit of the risk he runs by striking. That limit, which should not be unduly extended, is fixed at replacement by the employer or misconduct by the employee. The limitation is overstepped and the employee is harmed whether the denial of reinstatement results from the employer's mistake or from his blameworthy animus. In either case, the striker has nevertheless lost his job.

It is true that where denial of reinstatement results from the employer's reasonable and sincere mistake, there is no evil intention behind the harm suffered by the employee. While the employer's attitude may not be censurable, the employee too is free of blame. As between the victim of the mistake and the person who made the mistake, it seems just that the perpetrator bear the onus of his own error rather than that the burden of this error should be shifted to the employee who cannot guard against it. National Labor Relations Board v. Don Juan Co., 2 Cir., 185 F.2d 393, 394.

Said Circuit Judge Kerner, in National Labor Relations Board v. Illinois Tool Works, 7 Cir., 153 F.2d 811, 814:

"The test of interference, restraint and coercion under § 8(1) of the Act does not turn on the employer's motive * * *. The test is whether the employer engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act".

To the same effect, in National Labor Relations Board v. Hudson Motor Car Co., 6 Cir., 128 F.2d 528, 533, Circuit Judge Hamilton stated:

"When it is once made to appear from the primary facts that the employer has violated the express provisions of the Act, we may not inquire into his motives."

Cf. Morissette v. United States, 342 U.S. 246, 252–253, 72 S.Ct. 240, 96 L.Ed. 288;

Republic Aviation Co. v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372.

This must be viewed against the broad background of not only the language but also the history, the pattern and the purpose of the Act. In that light, the superior equities would seem to lie with the injured but innocent employee. Balancing the conflicting social interests here involved, we believe the dominant interest to be subserved, at the expense of the servient interest which must be sacrificed, is the interest of the employee.

The views we have expressed seem to find support in the decided cases. In Rubin Brothers, 99 N.L.R.B. 610, 611, it was said:

"* * * the honest belief of an employer that striking employees have engaged in misconduct provides an adequate defense to a charge of discrimination in refusing to reinstate such employees, unless it affirmatively appears that such misconduct did not in fact occur."

(The Court of Appeals for the Fifth Circuit, by a divided vote, denied enforcement of the Board's order, Rubin Bros. Footwear v. National Labor Relations Board, 203 F.2d 486.)

In Cusano v. National Labor Relations Board, 3 Cir., 190 F.2d 898, 902–903, Circuit Judge Staley stated:

"To adopt petitioner's view would materially weaken the guarantees of the Act, for the extent of employees' protected rights would be made to vary with the state of the employer's mind. We conclude that if the conduct giving rise to the employer's mistaken belief is itself protected activity, then the employer's erroneous observations cannot justify the discharge."

From the opinion of Circuit Judge Orr, in Salt River Valley Water Users Association v. National Labor Relations Board, 9 Cir., 206 F.2d 325, 329, we quote:

"That the Association (employer) may have acted in good faith, be-lieving itself justified in discharging Sturdivant (employee), is not material where the activity for which he was discharged was actually protected by the Act."

See, also, National Labor Relations Board v. Don Juan Co., 2 Cir., 185 F.2d 393; National Labor Relations Board v. Gluek Brewing Co., 8 Cir., 144 F.2d 847. Cf. National Labor Relations Board v. Office Towel Supply Co., 2 Cir., 201 F.2d 838, 840, citing and distinguishing the Cusano case, supra.

█ The cases cited in the brief of Industrial are not in point. In general, they hold, and we have previously indicated that such is the law, that an employer may freely discharge an employee, or refuse to reinstate an employee, for any reason, good, bad or indifferent, provided the discharge or refusal to reinstate does not cut across or deny some right or activity of the employee, guaranteed by the Act, such as collective bargaining, striking or joining a Union. But in our case, there is a right guaranteed by the Act—the right of an employee to reinstatement after a strike. That right is forfeited by serious strike misconduct. What we hold is that this right is not forfeited by the honest but mistaken belief of the employer that the employee has been guilty of strike misconduct, not misconduct apart from, and having no relation to, the strike.

If any of the expressions of Circuit Judge Hutcheson in Rubin Bros. Footwear v. National Labor Relations Board, 5 Cir., 203 F.2d 486, would seem to be inconsistent with the views expressed in the instant case, we can only decline to go along with such expressions.

We find nothing in the cases, so seriously stressed by counsel for Industrial, which militates against the conclusions we have reached in the case before us. In some of these cases, the only charge against the employer was anti-Union activity, and, in that context, the opinions stated generally that the employer could discharge, or fail to reinstate, an employee on any ground not connected with

discrimination against the Union. None of these cases involved an employer's failure to reinstate a striking employee upon the employer's honest but erroneous belief that the striker had been guilty of serious strike misconduct. See, National Grinding Wheel Co., Inc., 75 N.L.R.B. No. 112; National Labor Relations Board v. Ohio Calcium Co., 6 Cir., 133 F.2d 721, 728; Martel Mills Corp. v. National Labor Relations Board, 4 Cir., 114 F.2d 624, 631, 632. Cf. National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 347, 58 S.Ct. 904, 82 L.Ed. 1381; Associated Press v. National Labor Relations Board, 301 U.S. 103, 132, 57 S.Ct. 650, 81 L.Ed. 953.

The Board's order will be enforced as to Stallings and enforcement will be denied as to Williams. Accordingly, with the deletion of the provisions of the order affecting Williams, the order of the Board, as thus modified, will be enforced.

Order modified and enforced.