INTERNATIONAL ASSOCIATION OF MACHINISTS, LODGE 1652, Appellant,

v.

INTERNATIONAL AIRCRAFT SERVICES, INC. (CHARLESTON DIVISION), Appellee.

No. 8439.

United States Court of Appeals Fourth Circuit.

Argued Nov. 14, 1961.

Decided March 21, 1962.

Rehearing Denied May 5, 1962.

J. R. Goldthwaite, Jr., Atlanta, Ga. (Plato E. Papps, Louis P. Poulton, Washington, D. C., Adair, Goldthwaite & Stanford, Atlanta, Ga., and Robert B. Wallace, Charleston, S. C., on brief), for appellant.

T. E. Pedersen and D. A. Brockinton, Jr., Charleston, S. C. (Waring & Brockinton, Charleston, S. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, and BRYAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

The union brought this action under section 301 of the Labor Management Relations Act, 61 Stat. 156 (1947), 29 U.S.C.A. § 185(a) (1956), to compel the employer to submit certain grievances to arbitration. The question presented in the District Court and on this appeal is whether these grievances fall within the terms of a clause in a strike-settlement agreement made by the parties, excluding certain matters from the broad arbitration clause of the collective bargaining agreement. The appeal is from the summary judgment entered by the District Court for the company in respect to five of the grievances.

The collective bargaining agreement between the company and the union expired on November 9, 1960, but the employees continued at their work while negotiations for a new contract proceeded. The negotiations were unsuccessful. On November 30, the union called a strike and 110 employees quit work. In the course of the strike, 75 replacements for jobs vacated by the striking employees were hired and began working.[1] In addition, the company arranged for 27 other men to work at the factory, but these were not expected to report for work until a later date as it was necessary for them to move their homes from neighboring states. However, the strike ended on December 16, before any of these 27 had actually begun work for the company.

At the strike's termination, the company and the union entered into a strike-settlement agreement under which the parties were to sign a new collective bargaining agreement embodying terms already agreed upon. Paragraph 2 of the strike-settlement agreement provides for the orderly reinstatement of strikers as vacancies occur in the work force.[2] The collective bargaining agreement which was later drafted contains provisions governing seniority of employees and a no-strike clause.

Machinery for processing grievances and provisions for arbitration are found in Article V of the collective bargaining agreement. All disputes concerning the "interpretation or application" of the contract, as well as "any other grievance or dispute," are required to be settled through the four-step grievance machinery, followed by arbitration if accord is not reached. Grievances are defined as "disputes about the meaning and application of this agreement, and about alleged violations of this agreement." Article V, however, is limited by paragraph 4 of the strike-settlement agreement, the exclusion clause. This provides first for the retroactive application of the new collective bargaining agreement to November 9, the termination date of the

---

1. There is no agreement between the parties as to the exact number of employees who went on strike or on the number of replacements. As this point is not significant for decision on the issue of arbitrability, we shall adopt for present purposes the figures claimed by the company, as this will simplify the discussion.

2. Paragraph 2 of the strike-settlement agreement is as follows:
"2. That the Company shall prepare a recall list of all striking employees desiring reinstatement, by seniority within each respective classification and occupation, and shall reinstate such employees as vacancies occur in their classifications and occupations in accordance with the seniority lay-off and recall provision of the Agreement, provided that the Union shall have the right to check said recall list for both completeness and accuracy, and shall further advise the Company of the names of any employees who do not desire reinstatement."

prior contract. Nevertheless, there is a special provision for acts committed by either party in the interval between November 9 and December 16, when the strike was settled. It declares that any acts during that period that may have been in violation of the new collective bargaining agreement, shall nevertheless not be deemed transgressions of the contract or the subject of a grievance or arbitration.[3]

On December 23, the union filed six grievances with the company. The company processed them through the first three steps of the grievance machinery, but refused to enter upon the fourth step which, under the explicit terms of Article V of the collective bargaining contract, would have obligated the company to submit the grievances to arbitration, if no settlement were achieved. Grievances 1 through 4, the only ones of the six original grievances involved here,[4] complain that four named strikers should have been recalled to work on termination of the strike. This is based on the union's interpretation of paragraph 2 of the strike-settlement agreement and the seniority provisions of the collective bargaining agreement. The company answered that the jobs, which these four had formerly held, had been filled by four other men who were hired before the strike was settled, but permitted to report for work at a later date because they lived outside the state where the company was located.

On January 6, 1961, the union tendered two additional grievances. The first complained that the company improperly continued to hire new employees after December 16 when the strike-settlement agreement was signed, instead of recalling employees with seniority who had gone on strike. Unlike grievances 1 through 4 which pertain to certain named persons, this grievance apparently refers generally to all of the 27 out-of-state strike replacements who first reported for work after the strike had ended. The second of the two additional grievances tendered was that the company refused to discharge both the 75 replacements who had been hired during the strike and the 27 who reported after the strike's end, and would not restore the former strikers to their jobs. The position of the union was that these men had worked for less than 60 days and consequently, according to the new retroactive collective bargaining agreement, were in a probationary status only and without seniority.[5] Therefore, the union insisted, they must give way to employees with seniority rights. These two grievances the company would not proc-

---

3. The exact words of paragraph 4 of the strike-settlement agreement are as follows:

"4. That the date of said contract to be entered into between the Company and the Union shall be retroactive to November 9, 1960, but it is specifically agreed by the Company and the Union that any acts by the Company or the Union that may have been in violation of any of the agreed contract provisions occurring between the expiration date of the November 9 contract and the date of the signing of this Agreement, shall be deemed not to be in violation of said Contract, so that no such violation may be made the subject of a grievance or any other remedy provided for in said Contract."

4. We are not concerned here with grievance 5, relating to pay due the strikers at the newly established wage rate for vacation time accrued during the week of December 19, and grievance 6, involving pay due the strikers for the time spent in the week of December 19 reporting for work and, upon being told that their positions had been permanently filled, for turning in their tools and identification badges. The District Court held that these grievances should have been submitted to arbitration, and the company did not appeal.

5. Article VI, the seniority provision of the new collective bargaining agreement, is, in pertinent part, as follows:

"Section 1. All employees will be considered probationary employees until they have completed sixty (60) days of work from the date of hire and shall not have seniority status during this period. Upon the completion of this probationary period, the employee's seniority will be established retroactive to his last date of hire at the Charleston, South Carolina Division."

ess, even through the first step. This gave rise to the union's grievance 7, complaining of the company's refusal to accept these two additional grievances. Grievance 7 was processed through the third step of the grievance machinery, but the company resolutely declined to submit to the fourth step and arbitration.

I

 In Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), the Supreme Court held that federal courts should entertain suits brought under section 301 to compel performance by a reluctant party of its agreement to submit disputes to arbitration. Three subsequent Supreme Court decisions defined the courts' narrow function in interpreting and applying agreements to arbitrate.[6] Briefly summarized, the judicial role is limited to determining whether the recalcitrant party breached its promise to submit the grievances in question to arbitration. The merits of the controversy are to be left to the arbitrator, if the question is arbitrable, or to the traditional unregulated forces of labor and management, if not arbitrable. The precise issue before us is whether the grievances, which admittedly are encompassed within the arbitration clause of the collective bargaining agreement, also fall within the exclusion clause of paragraph 4 of the strike-settlement agreement.

United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), confronted the Supreme Court with a similar problem of deciding whether a grievance fell within the scope of an exclusion clause. In that case, the company laid off some of its employees because it had arranged for an outside firm to perform certain heavy maintenance work. The union complained that such contracting out violated the no-lockout provision of the collective bargaining agreement, while the employer insisted that the action it had taken was within its prerogative as a management function. The agreement contained the standard arbitration clause, covering disputes "as to the meaning and application" of the agreement, but excluded "matters which are strictly a function of management." The majority of the Court first found that the exclusion clause was ambiguous. This being the case, the Court thought that to decide definitively whether the exclusion clause encompassed contracting out would go a long way toward resolving the merits of the dispute. For, if contracting out were to be considered a management function, and therefore within the exclusion clause, it could hardly be said to violate the no-lockout provision of the contract. And conversely, if contracting out is not "strictly a function of management," then it would become reasonable to hold that the no-lockout provision had been transgressed. The Court reasoned that, to the extent that its interpretation and application of the exclusion clause were to foreshadow a decision on the merits of the dispute, the adjudicative role of the arbitrator, for which the parties bargained, would be diminished.[7] Considering this result one to be

---

6. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); see Hays, The Supreme Court and Labor Law, 60 Colum.L.Rev. 901, 919–33 (1960); Meltzer, The Supreme Court, Arbitrability and Collective Bargaining, 28 U.Chi.L.Rev. 464 (1961).

7. As Mr. Justice Douglas said:
"'Strictly a function of management' might be thought to refer to any practice of management in which, under particular circumstances prescribed by the agreement, it is permitted to indulge. But if courts, in order to determine arbitrability, were allowed to determine what is permitted and what is not, the arbitration clause would be swallowed up by the exception." 363 U.S. at 584, 80 S.Ct. at 1353.

avoided, the majority sent the case to the arbitrator for decision.

■ The effect of this holding is to confine judicial construction of arbitration exclusion clauses to instances where the matter in dispute is either clearly within the express terms of the exclusion clause or at least within the manifest purpose of that clause.[8] As Mr. Justice Douglas for the majority said, "In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." 363 U.S. at 584–585, 80 S.Ct. at 1354.

In the present case, grievances 1 through 4 charge that the company hired four new employees after December 16 instead of recalling four old ones who had participated in the strike. The first of the tendered, but rejected, grievances which provides in part the basis for grievance 7, complains generally that the company improperly hired after the strike had been settled the 27 out-of-state replacements and refused to rehire strikers. Grievances 1 through 4 make the identical complaint, although limited to four specified persons, and for this reason, we treat them together.

The precise issue before us is whether the grievances concern "acts by the Company * * * occurring between the expiration date of the November 9 contract and the date of the signing of this Agreement," December 16, so as to fall within the quoted language of exclusion found in paragraph 4. The union admits that these grievances were rooted in events occurring before December 16, but argues that the exclusion clause is inapplicable because the specific acts com-

plained of happened after that date. The company, on the other hand, asserts that it had arranged for the employment of the men before December 16 and was bound to honor its obligations to them. Thus, the union emphasizes the dates work was actually begun—events all occurring after December 16—while in the eyes of the company what happened after December 16 is but the inevitable culminating episode flowing from decisive events which had already occurred before that date. Whether or not these grievances fall within the exclusion clause depends upon what happenings are to be considered decisive.

■ It is a well-settled rule that an employer may fill positions left vacant by employees going out on an economic strike, and that he is not later "bound to displace men hired to take the strikers' places in order to provide positions for them." N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 347, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); Vogue Lingerie, Inc. v. N. L. R. B., 280 F.2d 224, 226–227 (3d Cir., 1960); see Olin Mathieson Chemical Corp. v. N. L. R. B., 232 F.2d 158, 160–161 (4th Cir., 1956), aff'd per curiam, 352 U.S. 1020, 77 S.Ct. 587, 1 L.Ed.2d 562 (1957); N. L. R. B. v. Industrial Cotton Mills, 208 F.2d 87, 91, 45 A.L.R.2d 880 (4th Cir., 1953). Under these cases, the critical time seems to be when the arrangements with the replacement workers became irrevocable and fixed, a readily determinable fact. Applying this rule to the present case, if the company is found to have bound itself irrevocably by contracts of employment made with the replacement employees some time before they went to work, then we think that the grievance is covered by the exclusion clause because the critical event, that of hiring, occurred within that period. On the

8. For a case where the grievance was clearly not within the terms of the arbitration clause, see Local 201, International Union of Electrical, Radio and Machine Workers v. General Electric Co., 283 F.2d 147 (1st Cir. 1960). See also cases where it was held that the breach of a no-strike clause was not an arbitrable issue: Drake Bakeries, Inc. v. Local 50, American Bakery & Confectionery Workers, 287 F.2d 155 (2d Cir. 1961); Vulcan-Cincinnati, Inc. v. United Steelworkers of America, 289 F.2d 103 (6th Cir. 1961).

other hand, if there was an informal arrangement in which the company told the men only that jobs would be available to them if they presented themselves at the plant, then there was not any hiring until the men began work and, since this occurred after December 16, the grievance would be arbitrable.

This issue of fact was raised in the District Court on the papers presented by both parties with their motions for summary judgment. As we only recently pointed out, "The standard laid down for district courts in passing on motions for summary judgment is strict." Clarke v. Montgomery Ward & Co., 298 F.2d 346, 348 (4th Cir., 1962). Summary judgment may be granted only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c), 28 U.S.C.A. Examining the record on appeal in this case, we conclude that there was a controversy as to when the new replacements were hired, and the District Court must hold a hearing for its determination.

■ The company submitted to the District Court affidavits from its Personnel Manager and two supervisory employees. The Personnel Manager stated that he knew that the two other supervisory employees were given the authority to "unconditionally hire and bind the Company" to employment contracts with out-of-state workers, and that they hired such men. The affidavits of the two supervisors alleged that they exercised their authority to hire workers, giving the replacements permission to report for work after they had settled their personal affairs. The union, for its part, in the grievances submitted to the company, alleged that the four named replacements were hired on various dates, all after December 16, and, as to the grievance which the company refused to process through the first step, that the company had hired a number of new employees after that date. An affidavit from one of the striking employees repeats the claim that the company continued to hire new employees after the strike had been settled. In addition, paragraph 5 of the union's motion for summary judgment alleged that the striking employees were not replaced until after December 16 because only then did the new employees begin work. We think that more evidence as to the precise nature of the arrangements between the company and these 27 replacements is needed before it can be said whether the men were hired during or after the period covered by the exclusion clause. We remand the case for this purpose.

The word "hire" may have been used by the parties and affiants in different senses, particularly since it represents as much a legal conclusion as a summary of a state of facts. Inquiry should be made in the District Court to ascertain when the new employees had payroll status and what, if any, enforceable legal obligations the company incurred in its arrangements with them. Only after a close scrutiny of the now undisclosed details can a legal judgment be made as to the exact date of hiring, whether it was before or after December 16.

We must point out that the District Court is limited on remand to considering only the factual question, the time of hiring. If it is found that this did not occur until the replacements reported for work, no argument that the purpose of the exclusion clause was to bar from arbitration controversies arising out of the strike can prevail. Nor can recourse be had to any bargaining history to resolve the issue. Arguments of this kind were pressed upon the Supreme Court in the Warrior & Gulf case and specifically rejected. Indeed, this rejection raised doubts in the mind of Mr. Justice Brennan who concurred and was the basis of the dissent of Mr. Justice Whittaker. On the other hand, if the properly supported finding should be that the replacements were hired during the strike, the requirement of the Warrior & Gulf case that, to avoid the reach of the arbitration clause, there must be an "express provision excluding a particular grievance from arbitration," would be

satisfied. Since an economic striker has no right to reinstatement once a replacement had been hired in his place, the exclusion clause would have no meaning whatsoever unless it excludes grievances complaining of the hiring of replacements within the specified time period.

A comparison of the factual differences between the present case and Warrior & Gulf illustrates the division of function between court and arbitrator in resolving questions of arbitrability. In Warrior & Gulf, the underlying facts were clear, but the meaning of the exclusion clause was ambiguous. Because the decision as to whether the established state of facts fell within the situation described in the exclusion clause required primarily an interpretation of that clause, the issue of arbitrability was sent to the arbitrator for decision. In the case before us, the ambiguity is in respect to the facts rather than the meaning of the exclusion clause. Once the facts bearing on the question of arbitrability are clarified, the question of the application of the exclusion clause is simple. But the issue of fact here is not one that may be appropriately disposed of by summary judgment.

■ The second of the tendered grievances must be treated differently. It complains of the company's refusal after the termination of the strike on December 16 to dismiss the replacement workers because of their probationary status and to reinstate strikers to their positions. This grievance, covering both the 75 men undisputably hired during the strike and the 27 men who reported for work only later, raises no issue as to whether they went to work in jobs formerly held by strikers. Rather, the grievance points to an alleged violation, which happened only after December 16, of the terms of the seniority provision of the new collective bargaining agreement, governing the lay-off and recall of employees, and paragraph 2 of the strike-settlement agreement, guaranteeing that employees with seniority shall fill all available job openings. Whatever the merits of this grievance, it does not come within the time period excluded from the grievance and arbitration procedures by paragraph 4 of the strike-settlement agreement, this exclusion being limited to events occurring between November 9 and December 16.

The company advances the argument that the grievance is not arbitrable because it directly contravenes paragraph 2 of the strike-settlement agreement which, the company contends, is the only provision controlling the rights of striking employees to reinstatement. Paragraph 2 says that strikers are to be reinstated only "as vacancies occur," and the company wishes us to interpret this to mean as vacancies arise from normal causes and not from wholesale displacements. However, we do not see how the argument based on this paragraph can be relied on by the company here. Paragraph 4 is the only clause excluding certain issues from arbitration, while paragraph 2 says nothing about arbitration. What the company is really contending is that the grievance is not arbitrable, not because it falls within the period of time excluded from arbitration by paragraph 4, but because the union's claim is utterly without merit, being clearly contrary to the terms of paragraph 2. However, this approach, similar to that adopted in the well-known case of International Ass'n of Machinists v. Cutler-Hammer, Inc., 271 App.Div. 917, 67 N.Y.S.2d 317 (1947), aff'd, 297 N.Y. 519, 74 N.E.2d 464 (1947), is precisely what the Supreme Court rejected in United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 566–567, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). As Mr. Justice Douglas there said, "The collective agreement calls for the submission of grievances in the categories which it describes, irrespective of whether a court may deem them to be meritorious." Id. at 567, 80 S.Ct. at 1346. As long as the grievance falls within the scope of the arbitration clause and is not within the exclusion clause, it is arbitrable. Therefore, the District Court in this case erred in not requiring

the company to process this grievance through the grievance machinery provided by the contract.

A comparison of our disposition of the second tendered grievance with our treatment of the other grievances illustrates the limited role of the court in this type of case. In discussing the first four grievances and the first tendered grievance, we say that, if the facts as determined by the District Court show that the replacements were hired during the strike, the grievance clearly falls within the exclusion clause. We view the exclusion clause itself, as distinguished from the facts bearing on its applicability, as clear, leaving no room for any tenable argument to the contrary; otherwise, it would be our duty under Warrior & Gulf to require submission of the issue of the meaning of the clause to the arbitrator. As to the last tendered grievance, however, we take the view that no matter how frivolous the merits of the grievance, as it is within the grievance and arbitration provisions, it must be processed through them. This difference in treatment is explainable by recalling that our only function is to apply the arbitration exclusion clause in deciding whether an issue is arbitrable, and not to interpret an ambiguous exclusion clause or to rule on the merits of the grievance itself.

## II

Before the hearing of the appeal, the company filed a motion to dismiss, alleging that the union no longer represents any employees of the company, and claiming that it therefore is not a "labor organization," and that as a result there is no federal jurisdiction under section 301(a) of the Labor Management Relations Act, 61 Stat. 156 (1947), 29 U.S.C.A. § 185(a) (1956). We do not doubt that the union represents few, if any, of the comapny's present employees. When in September, 1961, the company gave notice of its intention to terminate the collective bargaining agreement and petitioned the National Labor Relations Board to hold a representation election, the union, recognizing the alteration in its status, filed a disclaimer of interest. Pursuant to Board regulations, the Regional Director thereupon dismissed the company's petition. 29 C.F.R. § 101.18 (a) (Supp. 1961).

Despite the union's present weak condition, we hold that the District Court had jursidiction to entertain this complaint under section 301. Neither that section,[9] nor the language of section 2(5), defining the meaning of a "labor organization."[10] nor the legislative history[11] provides the answer, but we think that it would be anomalous and contrary to the spirit of the national labor legislation to construe the phrase "labor organization" as the company contends. Assuming, as we must for the sake of the argument, that retaining the strike replacements is a violation of the contract, a company may not be allowed further to violate its contractual obligations by refusing to arbitrate and then, after the union has been destroyed, oppose judicial relief because the union is no longer a "labor organization."

In cases where an employer's unfair labor practices and refusals to bargain so weakened the union that it no longer represented a majority of the employees,

9. Section 301(a) confers jurisdiction on the district courts to adjudicate suits for violations of contracts "between an employer and a labor organization representing employees." 61 Stat. 156 (1947), 29 U.S.C.A. § 185(a) (1956).

10. Section 2(5) defines a "labor organization" as one "in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 49 Stat. 450 (1935), 29 U.S.C.A. § 152(5) (1956).

11. The legislative history reveals only a purpose to make the definition of "labor organization" sufficiently broad to include employee-representation committees and the like within the ambit of the National Labor Relations Act. See S.Rep. No. 573, 74th Cong., 1st Sess. 7 (1935), reprinted in 2 Legislative History of the National Labor Relations Act 2306 (1935).

the courts have nonetheless consistently required the employer to cease and desist its unfair labor practices and bargain with the union. Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L. Ed. 1020 (1944); N. L. R. B. v. Norfolk Shipbuilding & Drydock Corp., 172 F.2d 813, 816 (4th Cir. 1949). The same principle is controlling here. A party should not be allowed to profit from his own violation of a contractual obligation, and it would be wrong to construe sections 301 and 2(5) to permit this result. The above principle is applicable here even though the company has not committed an unfair labor practice such as is forbidden by section 8(a). A proposal to make contract violations an unfair labor practice was dropped by the 80th Congress during its consideration of the Taft-Hartley Act, but only because it was deemed inadvisable to give the National Labor Relations Board jurisdiction over that kind of dispute. Contract violations were not thereby sanctioned, but were to be remedied through ordinary judicial processes. See Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 452, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

Nor would it avail the company to show that it acted in good faith. A party who binds himself by an arbitration agreement, and then refuses to process grievances and arbitration disputes, does so at his peril. If it later turns out that his refusal was in breach of his agreement, his good faith will not relieve him of his obligation. It remains the duty of the courts to hold the parties to their obligation, notwithstanding changed circumstances brought about by breaches of the agreement.

Accordingly, the summary judgment is reversed and the case remanded as to grievances 1 through 4 and the first tendered grievance, for a hearing to determine the facts as to the dates of hiring, and as to the second tendered grievance the case is remanded with directions to order its processing through the grievance machinery.

ALBERT V. BRYAN, Circuit Judge (dissenting).

No genuine issue of fact relating to the date the 27 replacements were hired and justifying a remand of the case to the District Court, it seems to me, is presented by the record. The appellant has not in this respect resisted the summary judgment. Both sides presented motions therefor; thus neither thought there was a factual conflict. The union does not complain of the accuracy or truth of the direct or inferential facts relied on by the District Judge. Its thesis of complaint throughout has been that he examined the facts at all; it urges that only the arbitrator could consider those facts. Consonantly the union's brief states, "There is no material issue of fact relative to the question of arbitrability presented by the pleadings and motions and exhibits thereto, all material facts being undisputed. Certain minor disputes of fact * * * are neither material nor relevant to the issue." At no time has the union denied that the 27 were irrevocably hired before December 16; rather, the "hiring" of which they complain is the coming of the 27 to work thereafter.

If these independent facts are not enough, one need only look at the strike-settlement agreement, as discussed *post,* for an attestation that no vacancies existed at the plant as of December 16, 1960 and immediately following. At least, however, the remand conclusively acknowledges the explicitness and clarity of the exclusion clause: the District Judge is directed to enforce it should he find the hiring was consummated before December 16. This recognition is highly significant in the decision of the remaining question in this case.

In my view this remaining question— the demanded discharge or "bumping" of both the 27 and the 75 immediately after December 16 for want of seniority—is explicitly withheld from arbitration by the exclusion clause of the strike-settlement agreement, as clearly revealed in

paragraphs 2 and 4 of that same document:

"2. [It is agreed] That the company shall prepare a recall list of all striking employees desiring reinstatement, by seniority within each respective classification and occupation, and shall reinstate such employees *as vacancies occur* in their classifications and occupations in accordance with the seniority, layoff and recall provision of the Agreement, provided that the Union shall have the right to check said recall list for both completeness and accuracy, and shall further advise the Company of the names of any employees who do not desire reinstatement." (Emphasis added.)

"4. [It is agreed that] The date of said contract to be entered into between the Company and the Union shall be retroactive to November 9, 1960, but it is specifically agreed by the Company and the Union that any acts by the Company or the Union that may have been in violation of any of the agreed contract provisions occurring between the expiration date of the November 9 contract and the date of the signing of this Agreement, shall be deemed not to be in violation of said Contract, so that no such violation may be made the subject of a grievance or any other remedy provided for in said Contract."

No vacancies existed on and after December 16 when the grievance was filed: all "vacancies" were then occupied, as paragraph 2 avouches.

Stated another way, not only were new men employed before December 16, but as *incumbents* they were endowed with a status fixed by the settlement agreement, a status which continued after December 16 by virtue of the subsistence of that agreement beyond that date. That agreement and that status were not displaced upon the inception of the seniority or "bumping" provisions of the collective bargaining agreement. These provisions had been arranged, as

the opinion of the Court notes, before the strike-settlement contract was signed. It was with the collective agreement in mind that the union and the employer stipulated that reinstatement should only follow "vacancies". Clearly the collective agreement was not to unmake the strike-settlement by effecting at once a discharge of all employees hired before December 16.

The filling of the "vacancies" was, it is next said, an act occurring after December 16. This can only be sustained on the hypothesis that immediately after December 16 the collective bargaining agreement ex proprio vigore created vacancies through its seniority clauses and instantly ousted the occupants. But the collective bargaining agreement does not purport to create vacancies; it merely sets the pattern for filling them "as vacancies occur". The interpretation of the Court wholly ignores the plain terms of paragraph 2 of the settlement agreement. The result is arbitrarily and abruptly to terminate all force of the strike-settlement agreement beyond December 16, 1960. Thus, upon the Court's opinion, the future immunity guaranteed both employer and union by that agreement for acts occurring before December 16—the very protection purposed by the agreement—was on that day ended. It is as if the parties the first moment after December 16 had rescinded the strike-settlement agreement.

This partial nullification of the strike-settlement agreement is made complete by the additional holding, in fragmentization of the agreement, that while paragraph 4 contains an exclusionary clause, paragraph 2 does not, ergo no exclusion is effective in respect to paragraph 2, especially in regard to reinstatement, vacancy and seniority. Surely the two paragraphs, in the absence of an express contrary direction, embrace each other.

Arbitration cannot be compelled by contradicting the obvious. No exclusionary clause, though precise as words could make it, would ever be effective if to make an arbitrable issue one need only deny the meaning of words. Just that

**818**

is essayed now. No review of the history of the bargaining—indeed, no consideration of any kind beyond the grievance and the parties' agreement—is necessary for the determination that the exclusionary clause here definitively precludes arbitration. This is all that is required of such a clause. United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed. 2d 1403 (1960).

I would affirm.