NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

BURNUP AND SIMS, INC., Respondent.

No. 20117.

United States Court of Appeals
Fifth Circuit.

Aug. 22, 1963.

Marcel Mallet-Prevost, Asst. Gen. Counsel N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, Melvin Pollack, Atty., N.L.R.B., Washington, D. C., Stuart Rothman, Gen. Counsel, Melvin J. Welles, Robert A. Armstrong, Attys., N.L.R.B., for petitioner.

Ray C. Muller, Fisher & Phillips, Atlanta, Ga., for respondent.

Before TUTTLE, Chief Judge, JONES, Circuit Judge, and DeVANE, District Judge.

JONES, Circuit Judge.

The National Labor Relations Board here petitions this Court to enforce its order against the respondent, Burnup and Sims, Inc., 137 N.L.R.B. 766.

The respondent was engaged in the manufacture, sale and installation of concrete products on September 20, 1961, when nineteen of respondent's employees, most of whom were truck drivers, held a meeting near one of respondent's plants and discussed wages. Selecting Robert Davis their spokesman, the employees decided to ask for a 15-cent an hour wage increase. On the next morning they made such a request to the plant superintendent, Doyle Tawney. When the plant manager, Carl Moritz, arrived the superintendent informed him that the men refused to work unless they were given a raise. Moritz said to assemble them in a warehouse nearby. On being assembled, the men, speaking through Davis, reiterated their demand for a 15-cent raise. As found by the Trial Examiner and adopted as a fact by the Board, employee Harmon "conspicuously align[ed] himself with Davis" during their discussion. The meeting bore no fruit and Moritz asked the employees to return to work. They refused and instead went in front of the warehouse to discuss the matter further among themselves. Davis and another employee, John McKnight, left in McKnight's car to contact a union representative. They were unsuccessful and returned to the meeting where Moritz was addressing the men who were still assembled in front of the warehouse. Prior to their return, Harmon and several others had asked questions concerning the wage increase. Davis reassumed the leadership of the group after he got back and the meeting finally ended with Moritz promising the increase within thirty days. Thereafter, the men returned to work. That evening Moritz asked McKnight if he would have gone through with what he had started that morning. After ascertaining that Moritz was referring to the walkout McKnight replied, "Yes, my father told me once I made my play to follow it through and I had made my play."

On September 22, 1961, Davis contacted the president and vice president of Local 172 of the Airline Supply Technicians (affiliated with the Teamsters Union) and was told to find out whether a substantial number of employees were interested in the union.

Three days later, Moritz told Tawney that he intended to grant pay increases and that he would have to reduce his working force. He asked Tawney for a list of employees to be considered for layoff.

■ On September 29, 1961, McKnight, Davis and Harmon were laid off. The names of seven men were brought up as possibilities and these three were picked for reasons, according to Moritz and Tawney, other than their labor activities. However, the Board found, overruling the Trial Examiner, that the layoffs were discriminatorily motivated in violation of Section 8(a) (3) and (1) of the National Labor Relations Act, as amended. The true ground, according to the Board, was the prominent part these three had played in the walkout. Suffice it here to say that taking the record as a whole, we cannot say that this finding is not supported by substantial evidence. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

On October 1, 1961, wage increases were put into effect, ranging from five to fifteen cents an hour, for all the employees in that operation. Moritz had been authorized by the home office prior to the walkout to grant raises of five cents an hour across the board. However, up until October 1, he had not done so.

The events which we regard as essential in reaching our decision occurred after the layoffs. On October 13 or 14, 1961, Tawney was approached by employee Pate and told that Harmon and Davis, while soliciting him to sign a union authorization card, had made threats against company property. Tawney testified that Pate told him that Harmon actually made the threatening remark with Davis standing by. Tawney testified,

"And during the course of the conversation they made the statement that if they didn't get their jobs

back, if the union didn't get in, it would be fixed so no one could work.

"Q. It would be fixed so no one could work? A. By using dynamite on the silos, the storage silos."

When Tawney reported his conversation with Pate to Moritz, the latter said "we have really got trouble." On October 25, 1961, Pate signed a sworn statement to the same effect, except that he attributed the remarks to Davis, rather than to Harmon. However, again he said that Harmon and Davis were together when the remarks were made.

On November 8, 1961, Moritz sent identical letters to Davis and Harmon which read as follows:

"When you were laid off on September 29, 1961, it was with the understanding that business in your particular job was slow and that you would have 'first call' on any job that came available once business picked up.

"Business is now picking up, but I regret to advise you that I cannot re-employ you.

"It has come to my attention that you made or condoned serious threats to damage property of the company should the union fail to win its election. Under such circumstances I cannot re-employ you with our company."

Neither Harmon nor Davis made any attempt to correct the respondent concerning the letters of discharge. At the hearing before the Trial Examiner, both Davis and Harmon denied that they had made these threats to Pate. Harmon said he had visited Pate once, alone, to get his signature on an authorization card. Davis testified that he never visited Pate. Each denied ever having made these statements or the other having made them in his presence. Pate did not testify.

In order to complete this brief résumé of the facts, we shall finish the McKnight story. He was subsequently taken back as a truck driver and eventually dismissed for cause. The Board did not

order that respondent reinstate him but simply that he be made whole for the wages lost between the time of his discriminatory layoff and recall. With this we agree.

As for Davis and Harmon, the Board found that respondent had violated Section 8(a) (3) and (1) of the Act in discharging them and ordered their reinstatement with back pay from the time of their layoff on September 29, 1961. As before noted, the Trial Examiner held that the General Counsel had failed to prove the illegality of both the layoffs and the discharges and recommended that the complaint be dismissed.

There are three issues in the case. First, whether there is substantial evidence supporting the Board's finding that the layoffs were discriminatorily motivated. As we pointed out in the recital of the facts, the record taken as a whole contains sufficient evidence to uphold the Board's finding. The other two issues raise questions of law. We are to decide whether an employer can dismiss an employee on the belief held in good faith that he has engaged in serious acts of misconduct or disloyalty, even though the alleged misconduct occurred during a time when the employee was engaged in activity protected by the Act. The Board found as a fact that the threats were not made. Therefore we must describe the belief as being in good faith, but mistaken. The third issue involves the inclusion of the period between the Trial Examiner's report and its reversal by the Board in the computation of back pay. Our resolution of the first of these two issues renders a decision on the other unnecessary.

In its opinion, the Board relies on Rubin Bros. Footwear, Inc., 99 N.L.R.B. 610, order vacated and set aside, 5th Cir. 1953, 203 F.2d 486, holding "that, when in the course of protected activity, employees are accused of misconduct and a respondent takes action affecting their employment tenure based on a belief that the employee has engaged in misconduct, such an honest belief would be an adequate defense to a charge of discrimina-

tion for refusing to reinstate such employee *unless it affirmatively appears that such misconduct did not in fact occur.* 137 N.L.R.B. 766, 772–73 (Emphasis in original). Crediting the denials of Harmon and Davis and noting that Pate had not testified nor had any attempt been made to use his affidavit as proof of the truth of the statements made therein, the Board found such affirmative proof. The resolution of this issue turns on whether the italicized words from the Board's opinion state a sound and controlling rule.

The respondent relies on this Court's disposition of Rubin's on appeal. In that case one Rawlins, who had allegedly been discriminatorily discharged for protected activity, was standing at the entrance of the employer's establishment with a group of fellow strikers. When two non-striking employees approached to go to work, they were beaten by members of the group. One of them told the company that Rawlins had struck him. But the Board found that this was not true and ordered Rawlins' reinstatement. This Court vacated this order on the ground that "whether he did or did not strike a blow, he was, under the undisputed testimony and in the sense of criminal participation, aiding and abetting in the fight." 203 F.2d 486, 488. In its discussion, however, the Court stated a principle which we apply in this case. There the Court said:

> "But over and above all this, there is a fatal defect in the finding of examiner and board that, even if the employers in good faith believed, as the undisputed evidence shows, and even the board concedes they did, that Rawlins was a brawler, and discharged him in good faith because they so believed, and not for his union activities, the discharge could be held discriminatory unless the employer assumed and discharged the burden to the satisfaction of examiner and board that the belief was well founded, that is that Rawlins had in fact struck a blow as Odum claimed.

> "This court, and we think, all other courts have held to the contrary. If anything is settled in labor law and under the act, we think it is that membership in a union does not guarantee the member against a discharge as such. It affords protection against discharge only where it is established that the discharge is because of union activity. The board is without power, as it seems to have undertaken in this and in some other of its decisions to do, to lay down a rule to the contrary." 203 F.2d 486, 487–88.

We so hold. If the employer can establish that he had a good faith belief that an employee has engaged in misconduct such as here, it need not appear that the alleged misconduct in fact occurred. The burden of proving that an employer has discouraged union membership by discrimination in regard to terms and conditions of employment is on the General Counsel. N.L.R.B. v. Ray Smith Transport Co., 5th Cir.1951, 193 F.2d 142. Moreover he must show, not that the employer's activity tended to discourage union membership, but that there was discrimination against an employee motivated by a desire to discourage protected activity. See the concurring opinion of Mr. Justice Harlan in Local 357, Teamsters Union v. N.L.R.B., 365 U.S. 667, 678–80, 81 S.Ct. 835, 6 L.Ed.2d 11. This is not a case such as Radio Officers' Union v. N.L.R.B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455, where the Supreme Court stated that "an employer's protestation that he did not intend to encourage or discourage must be unavailing where a natural consequence of his action was such encouragement or discouragement. Concluding that encouragement or discouragement will result, it is presumed that he intended such consequence. In such circumstances intent to encourage is sufficiently established." 347 U.S. 17, 45, 74 S.Ct. 323, 338, 98 L. Ed. 455. In that case the employer had given wage increases and other benefits to union members but had declined to do so for nonunion employees. The union

was the sole bargaining representative for the plant. The employer defended its action on the ground that it was merely responding to union pressure and had no intent to encourage unionism. Furthermore, it claimed, this action could not have the effect of encouraging union membership, because the union was closed and the nonmembers could not get in if they wished. This decision points up the importance in this type of case of the motive of the employer. Discharging an employee is not in itself discouraging to organizational or other protected activities. In fact if it does discourage the discharged employee or his fellow workers, it is not a violation of the Act if the employer's motivation was not discriminatory. Wage and benefit differentials inherently encourage; a discharge does not inherently discourage. The difference is crucial. In the latter situation, motivation is determinative; in the former it is irrelevant. In this case the motivation was the belief that men had threatened to dynamite property; the intent was to rid the plant of those from whom the threat was believed to have emanated. We think it cannot be said that this was discrimination discouraging protected activity.

Nor do we feel that the rationale of Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372, applies. There the Court held, inter alia, that a nondiscriminatory no-solicitation rule as applied against employees soliciting for union members during the employees' free time in a plant whose personnel was widely scattered violated Section 8(a) (1) of the Act. It followed therefore that discharges made pursuant to such a rule violated Section 8(a) (3). "It seems clear" said the Court, "that if a rule against solicitation is invalid as to union solicitation on the employer's premises during the employee's own time, a discharge because of violation of that rule discriminates within the meaning of § 8(3) in that it discourages membership in a labor organization." 324 U.S. 793, 805, 65 S.Ct. 982, 988, 89 L.Ed. 1372. The defense of the discharge there consisted of the invalid rules; without the rules there was no defense. Here on the other hand the defense is a bona fide attempt to protect company property.

The petitioner stresses N.L.R.B. v. Local 1229, Int'l Bhd. of Elec. Workers, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195, as supporting its position. In that case ten striking television technicians were fired because of a handbill distributed to the public denouncing the quality of their employer and its programs. The handbills made no reference to the labor dispute. The Court held that where nine of the technicians were involved, their acts of disloyalty warranted their dismissal. However, as for the tenth who had not actually participated, the Court stated:

"The courts have refused to reinstate employees discharged for 'cause' consisting of insubordination, disobedience or disloyalty. In such cases, it often has been necessary to identify individual employees, somewhat comparable to the nine discharged in this case, and to recognize that their discharges were for causes which were separable from the concerted activities of others whose acts might come within the protection of § 7. It has been equally important to identify employees, comparable to the tenth man in the instant case, who participated in simultaneous concerted activities for the purpose of collective bargaining or other mutual aid or protection but who refrained from joining the others in separable acts of insubordination, disobedience or disloyalty. In the latter instances, this sometimes led to a further inquiry to determine whether their concerted activities were carried on in such a manner as to come within the protection of § 7." 346 U.S. 464, 474, 475, 74 S.Ct. 172, 177, 178, 98 L.Ed. 195.

The question here presented did not arise in the Local 1229 case. No claim was presented to the Court that the tenth man should not have been reinstated. Moreover, the Court went on to say that "[t]he legal principle that insubordina-

tion, disobedience or disloyalty is adequate cause for dismissal is plain enough. The difficulty arises in determining whether, in fact, the discharges are made because of such a separable cause or because of some other concerted activities engaged in for the purpose of collective bargaining or other mutual aid or protection which may not be adequate cause for discharge." 346 U.S. 464, 475, 74 S.Ct. 172, 98 L.Ed. 195. It is apparent that in this case the Court was thinking in terms of an employee discharged for a legitimate cause and one discharged for protected activities. The case is not in opposition to our holding. In fact we take the language last quoted as supporting our view. Here there was an honest belief that the employee had engaged in unprotected activity which warranted dismissal. The General Counsel cannot dispose of his burden by showing that the belief was erroneous; he must go further and show that the belief was not bona fide. The test for determining whether a discharge is wrongful under such circumstances as are presented by this case is the motive behind it. N.L.R.B. v. Adkins Transfer Co., 6th Cir. 1955, 226 F.2d 324. "What is vital is whether [a change in union prestige] results from discrimination and such discrimination had as its purpose encouraging or discouraging union membership." N.L.R.B. v. Dalton Brick & Tile Corp., 5th Cir.1962, 301 F.2d 886, 896. Under this test the Board is not entitled to the enforcement of its order.

The Board relies on N.L.R.B. v. Industrial Cotton Mills, 4th Cir.1953, 208 F.2d 87, cert. den. 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086. There a striking employee was taken into custody for throwing tacks on the road during the course of a strike but later released. The employer refused to reinstate him after the strike on the ground that he had engaged in this destructive and unprotected activity. It was found as a matter of fact that he had not thrown any tacks. The employer resisted the Board's order on the ground that it had had an honest belief that the employee had behaved reprehensibly. The Court held, however, that the mistaken belief was no defense where the employee was engaged in admittedly protected activity and was in fact innocent of the charges for which he was discharged. There the Court said:

"It is conceded by counsel for both Industrial and the Board that if Industrial had refused reinstatement to Stallings on the honest but mistaken belief that Stallings had been guilty of some crime, such as arson or robbery, entirely disconnected with the strike, the Union or concerted activity of the employees, then the Board could not order his reinstatement. Such conduct is without the ambit and beyond the purview of the National Labor Relations Act (hereinafter called the Act), 29 U.S.C.A. § 151 et seq.

"The question then remains whether the Board has the power to order the reinstatement of Stallings when his employer has refused reinstatement to him after the strike on account of the employer's honest but mistaken belief that Stallings had been guilty of *strike misconduct*. By the term 'strike misconduct,' we mean, broadly, misconduct arising out of, developed by, or closely connected with, the strike. The Board, correctly we think, answered this question in the affirmative." 208 F. 2d 87, 90.

Perhaps the only material difference between this case and Industrial Cotton, supra, is that the latter involved a strike and the former involves solicitation for union membership. But we shall not strain the point by seeking a distinction in this difference. Both activities are protected. But likewise we cannot agree with the distinction drawn in Industrial Cotton between unprotected activity related to that which is protected, and unprotected activity not so related. We believe that unprotected activity is unprotected. A good faith belief that the employee has engaged in it is sufficient reason to discharge him no matter what the circumstances. This does not mean

that the circumstances may not indicate bad faith. And the fact that the employee was engaging in protected activity might be a factor in determining that the employer was not in good faith. But given the good faith in either context it is our view that the employer is at liberty to take such disciplinary measures as he finds appropriate. As we read the opinion in the Industrial Cotton case the court would sustain the employer in refusing reinstatement to one who was honestly but mistakenly believed to have been guilty of arson, unless the property burned was the dwelling or place of business of the employer and the discharged employee had been soliciting union membership. We are not willing to adopt a rule based upon such reasoning. Following Industrial Cotton is N.L.R.B. v. Cambria Clay Products Co., 6th Cir. 1954, 215 F.2d 48, which reaches the same result and adopts the reasoning of the Industrial Cotton case.

Two other cases are cited by the Board as sustaining its holding, In re Cusano, 3rd Cir.1951, 190 F.2d 898, and Salt River Valley Water Users' Association v. N.L.R.B., 9th Cir.1953, 206 F.2d 325. In the Cusano case there was nothing to substantiate the claim that the employer had a good faith belief that the employee had done the misdeed, in this case lying to his fellow employees about the firm's profit figures.

There is, however, dicta in the Cusano opinion which may not be in accord with our holding. In assessing the argument made in the case that there was no violation where the basis for the discharge was a reasonable belief that the employee had lied, the Court stated:

"It is true that an employer may discharge an employee for a good reason, a bad reason, or no reason at all. * * * This rule, however, is necessarily limited where an employee is engaging in activities protected by the Act. The right of a union official or representative to inform his fellow employees of the proceedings at the Board's regional office is certainly one of the activities so protected. To adopt petitioner's view would materially weaken the guarantees of the Act, for the extent of the employees' protected rights would be made to vary with the state of the employer's mind. We conclude that if the conduct giving rise to the employer's mistaken belief is itself protected activity, then the employer's erroneous observations cannot justify the discharge." 190 F.2d 898, 902–03.

If, as the Court states, the employer can discharge an employee for no reason at all, it would seem that he could discharge him for a bona fide belief that he had a good reason. But, as we said before, this case is inapposite for the reason that there was no real substance to the claim of good faith.

In the Salt River Valley Water Users case, the employee had been discharged for protected activity. The employer contended that in good faith it believed that his acts justified dismissal. As the Court correctly held, the employer's good faith is immaterial "where the activity for which * * * [the employee] was discharged was actually protected by the Act." 206 F.2d 325, 329. This situation is plainly different from the one here, where the reason for the discharge was the honest belief that the employee had engaged in misconduct outside the protection of the Act.

■ The Board followed its decision in the Rubin case, 99 N.L.R.B. 610, buttressed primarily by the Fourth Circuit's Industrial Cotton opinion. If we were not disposed to follow the decision of this Court in the Rubin case as a precedent, we would apply the sound principles there stated, with the result that we do not enforce that portion of the Board's order requiring reinstatement of Davis and Harmon. We are of the opinion, and so hold, that Davis and Harmon should be made whole for any loss of pay suffered by them during the interval between the date they were laid off and the date they were discharged. The Board's order is modified accordingly. As order-

**64**

ed by the Board, McKnight is entitled to be made whole for loss of pay. The Board's order will be modified, and as modified will be enforced.

Modified and enforced.